Rogelio **DELACERDA**, Appellant

v.

The **STATE** of Texas, Appellee.

No. 01–09–00972–CR.

Court of Appeals of Texas, Houston (1st Dist.).

July 21, 2011.

Leah M. Borg, Houston, TX, for Appellant.

Lisa G. Porter, Assistant District Attorney, Harris County Criminal Justice Center, Patricia R. Lykos, Harris County District Attorney, Houston, TX, for Appellee.

Panel consists of Justices KEYES, SHARP, and MASSENGALE.

## OPINION

EVELYN V. KEYES, Justice.

A jury convicted appellant, Rogelio Delacerda, of murder and assessed punishment at thirty-five years' confinement and a $10,000 fine.[1] In twelve issues, appellant contends that the trial court (1) lacked jurisdiction due to an allegedly invalid order assuming jurisdiction from the juvenile court; (2) erroneously allowed the State to ask improper commitment questions during voir dire; (3) failed to pronounce that a defense exhibit was admitted, which precluded the jury from having all the evidence during deliberations; (4) and (5) erroneously permitted an officer to characterize an interview with appellant, conducted while he was a juvenile, as "not helpful" and erroneously denied appellant's motion for mistrial relating to the officer's testimony; (6) erroneously permitted an officer to testify regarding a statement by a witness made while viewing a photospread; (7) erroneously admitted three photographs located in the autopsy report without the proper predicate; (8) erroneously denied appellant's requested accomplice-witness jury charge instruction; (9) erroneously overruled appellant's objection to the transferred intent instruction in the charge; (10) erroneously denied appellant's motion for mistrial after the State mentioned a hearsay statement not introduced in evidence during its closing argument; (11) erroneously permitted an officer, during the punishment phase, to testify regarding the national criminal activity of the Latin Kings gang, without showing any connection to appellant; and (12) erroneously denied appellant's motion for mistrial after the State described the activities of the Latin Kings and called appellant a "gangster" during its punishment-phase closing argument.

We affirm.

## Background

On January 21, 1997, the complainant, seventeen year old Jesus "Robert" Contreras, was walking home from Stephen F. Austin High School in southeast Houston with his twin brother, Albert, and their friends, Gene Cantu, Raul Rodriguez, Chris Aviles, and Julio Lara. As the group

---

1. *See* TEX. PENAL CODE ANN. § 19.02(b)(1)-(2) (Vernon 2011).

walked home on Dumble Street, a newer-model navy blue truck drove past. Albert Contreras testified that he saw three people inside the truck—a male driver, a male passenger, and a female sitting in between—and one person lying in the truck bed, who kept "popping his head up." Albert stated that he recognized the person in the back of the truck as someone whom he had seen around school two or three times, but he did not know his name. Albert testified that no one in his group said anything to the truck's occupants as they drove past, but the truck stopped and the passenger looked at the boys after the truck had driven by. Albert did not recognize the passenger as a fellow student.

The truck continued down Dumble and turned right onto Polk Street. As the boys crossed the intersection of Dumble and Polk, Albert saw that the truck had stopped and the person in the back of the truck was speaking to the people in the truck's cab. Albert testified that the truck made a U-turn and turned back onto Dumble, driving in the same direction that the boys were walking, and passed the boys as they reached a tire shop. At the tire shop, the passenger pulled out a gun and shot approximately five or six times at the group. After the passenger stopped shooting and the truck drove away, Albert looked for his brother and found him underneath a piece of plywood, leaning against the wall of the tire shop. Robert had a gunshot wound to his left lower back and died later that night at the hospital. Albert testified that neither he nor his brother was involved in a gang and that neither of them had had any altercations with other students at school in the week before the shooting. The State did not ask

Albert on direct examination whether he viewed a police photospread or whether he identified anyone in that photospread.

On cross-examination, Albert testified that he told police that he thought he could identify the person in the back of the truck as someone he had seen at school.[2] Houston Police Department (HPD) Officer P. Guerrero showed Albert a photospread. When asked on cross-examination if he could identify anyone in the photospread, he responded that he did not recognize the person whom he saw in the back of the truck. Albert also stated that when he viewed the photospread he did not recognize the people in the cab of the truck, nor did he recognize the shooter. On redirect, Albert testified that he did not remember identifying the person in the back of the truck when the police showed him the photospread. The next morning, the State recalled Albert and asked him to identify the photospread that he viewed. Albert identified his signature on the second page of the display, which was located next to the position of the second picture. Albert reiterated that he could not recall identifying anyone in the display.

Raul Rodriguez testified that he recognized the passenger as someone with whom he thought he had gone to middle school, and he stated that, although the passenger was Hispanic, he had distinctive "Asian-looking" eyes. Raul acknowledged that, at the time of the shooting, he, Julio, who was shot in the leg during this altercation, and Gene were all members of a neighborhood gang called PSV, located in the Second Ward. To Raul's knowledge, neither Robert nor Albert Contreras was a member. At trial, Raul identified appellant as the shooter.[3]

---

**2.** Gene Cantu also testified that the person in the back of the truck looked like someone he had seen at school. He agreed that only the passenger, whom he did not recognize, had a

gun and that the person in the back of the truck did not.

**3.** On cross-examination, Raul acknowledged that in his original police statement he in-

Carlos Martinez, who also attended school with Robert and his friends, testified that after school on the day of the shooting he met up with his friends, David Cruz and Tommy Barron, to get a ride home. He testified that, as they were waiting for their ride, David showed them a gun that he had in his waistband. Carlos stated that David's cousin picked them up in a truck and that he was accompanied by a male passenger and a female sitting in between; Carlos did not know any of the people in the truck. Carlos testified that he, David, and Tommy all jumped in the back of the truck and lay down. At one point, Carlos heard someone in the front of the truck ask David "Is that them?" and he heard David reply, "I think so." Carlos did not look to see to whom they were referring. While they were in the truck, Carlos saw David hand a gun to the passenger. Carlos testified that he was scared and did not know what was about to happen. Carlos then testified that he heard the passenger ask David "if he wanted [the passenger] to shoot at him," and after David responded, "I don't know," Carlos heard gunshots. Carlos stated that no one in the bed of the truck fired a gun.

After the shooting, the driver dropped the boys off at a park, and the passenger handed the gun to David. Carlos stated he had no idea that a shooting was going to happen and that he "caught a ride with the wrong people that day." Carlos testified that when he initially spoke to the police he told them that David was the shooter because David had told Carlos and Tommy that he "didn't want nobody to take the blame for him." However, later on the same day that he gave this statement, Carlos told police that the passenger was the shooter.

On cross-examination, Carlos stated that he knew David had been having trouble with PSV members and that David had a gun with him on the day of the shooting. He also stated that, after they were already in the back of the truck, he heard David say, "Now you're going to learn about drive-bys." Carlos testified that he knew what this meant but that it was too late for him to get out of the truck. Carlos also testified that, the Friday before the shooting, David had told Tommy that he and his friend had been beaten up by PSV members and that David was going to "pop a cap at," or shoot, those involved. Carlos further testified that after he had given his first statement to police, in which he named David as the shooter, he asked the officer driving him home what would happen if he had lied in his statement and the officer replied that he would be in "big trouble." At this point, Carlos decided, on his own, to "tell the truth" because he did not want to get into trouble. When Carlos spoke to the officers a second time, he named appellant as the shooter.

David Cruz testified that on the Friday before the shooting he and one of his friends were walking home when they were "jumped" by approximately twenty to thirty PSV members. After this incident, David called his cousin, Jose Carreon, told him that he was having problems with people from school, and asked Jose if he could take him home from school the next week. On Saturday, Jose and appellant came to David's house to talk about the situation and to offer advice and support. David testified that appellant gave him a gun "for protection." David brought the gun to school on Tuesday, January 21, and showed it to his friend Edgar, who had been involved in the incident on the previous Friday. David could not recall if he showed the gun to anyone else. He stated

formed the police that he did not see the

person who fired the gun.

that right before school let out on Tuesday he had another altercation and was chased by a group of unnamed boys.

David testified that Jose, accompanied by his girlfriend, Emily Hugo, who owned the truck, and appellant, picked him up from school. When they arrived, appellant asked David for the gun, and, after he handed it over, David climbed in the back of the truck with Tommy and Carlos. David stated that the three boys were lying down in the back because they did not want other students to see where they lived, and he gave directions to Jose while lying down. After Jose turned onto Polk, David informed him that he was going the wrong way to his house, and Jose turned back onto Dumble. After Jose turned, David testified that he heard a group of PSV members throwing things at the truck and that he heard appellant talking to them. Appellant then asked David "if that was them," and, after David responded that it was not, appellant started shooting "on his own." David testified that he had only brought the gun to school to scare the people who were harassing him and that he did not want the situation to escalate to the point of a shooting.

David stated that, after the shooting, Jose started arguing with appellant and Emily was angry and crying. Jose then drove to a park and dropped off David, Tommy, and Carlos. Appellant got out as well, told David and the boys to "keep [their] mouths shut," and handed David the gun. David testified that all three boys were scared and that he told the others to say that he was the shooter "so someone else won't go down for [David's] problems." David stated that he kept the gun at his house for approximately three days before appellant came and picked it up "so [they] wouldn't get caught." He further testified that he gave a statement to the police on January 29, 1997, and he told them that appellant was the shooter.

On cross-examination, David testified that he did not remember telling Carlos and Tommy before they got in the truck that "today, they [were] going to learn about drive-bys." He further stated that he had seen appellant and Jose together on several occasions and that appellant had been to his house "a lot of times."

Emily Hugo testified that, on January 21, Jose drove her back to their school, Cy–Falls High School, so she could attend after-school tutorials. When they arrived at school, she went inside to call her father and to check a voicemail that Jose had received from David on his pager. As Emily was walking back to her truck to tell Jose that David had requested a ride home, appellant asked her if she could give him a ride home. Emily testified that, when they arrived at David's school, appellant got out of the truck and then sat back down in the passenger seat, and David and his friends climbed into the back of the truck and remained there. Emily did not see David hand appellant a gun, and she did not remember hearing any conversations in the truck between David and appellant.

Emily testified that, at one point, a group of kids walking on Dumble started yelling at the truck and appellant started yelling back. Immediately afterwards, Emily saw appellant pull a gun from his waistband and start shooting at the group of kids. Emily testified that, after the shooting, she started crying and was in shock. After Jose dropped David and his friends off, Jose, Emily, and appellant drove back across Houston to pick up Emily's younger sister from school. Emily stated that she did not kick appellant out of the truck at that point because she was scared and "didn't know what to do." When they dropped appellant off at his

house, he told Emily and Jose not to tell anyone what had happened.

Emily and Jose watched the news together on the night of the shooting and learned that one of the boys had died. Emily testified that she was "scared and sickened," but she did not go to the police at this point because she was waiting for her mother to return to town so she could talk to her about the shooting. Emily spoke to her parents five days after the shooting, and, after her parents contacted a lawyer, she met with the police to give her statement. She testified that she did not talk to appellant again after the shooting, but she listened in on a phone conversation that he had with Jose, in which appellant asked which one of them had called the police to turn him in.

Shortly after the shooting, Jose's brother washed Emily's truck, although both Jose and Emily testified that he did this of his own volition and not at the request of either of them and that he had washed the truck on previous occasions. Jose's brother found one or two shell casings in the truck and threw them away. Emily testified that she did not remember having a conversation with appellant's then-girlfriend in which Emily told her to say that appellant was with her on the afternoon of the shooting.[4]

On cross-examination, Emily acknowledged that her attorney negotiated an immunity deal for her with the district attorney's office, but she stated that she did not know any details about that deal. Emily also testified that HPD homicide officers picked up her truck from her house on Friday, January 24, 1997, two days before

Emily spoke to her parents about the shooting. Emily did not recall whether the back license plate from her truck was missing on the day of the shooting, but she was certain that no one took it off after she, Jose, and appellant left their school and before they arrived at David's.

HPD Homicide Investigator H.A. Chavez testified that officers received an anonymous Crime Stoppers tip that provided appellant's name. Officers then went to appellant's house, discovered that appellant was only sixteen years old, and asked his mother for permission to speak with him. After she agreed, officers escorted appellant to the Homicide Division office. At trial, the State asked Investigator Chavez whether appellant was "helpful" in his interview. Defense counsel objected to discussing the contents of the interview unless the State could demonstrate that the officers followed the procedural requirements in the Family Code for taking the statements of juveniles and objected to the implication that appellant was not helpful because he was dishonest. The trial court overruled the objection, and the State again asked Investigator Chavez whether he would say that appellant was helpful in the officers' investigation. Defense counsel objected "for the same reason we stated on the record." The trial court again overruled the objection, and Investigator Chavez testified that appellant was not helpful. The State then asked whether Investigator Chavez had any indication that appellant "had any knowledge of this incident." Investigator Chavez responded that "[he] felt that [appellant] possibly knew more than he was telling, but—," and defense counsel object-

---

4. Monica DeLeon, appellant's girlfriend at the time of the shooting, testified that appellant told her that, if anyone asked where he was on January 21, she was to say that she took him home from school. Monica acknowledged that in her written statement she in-

formed the police several times that Emily had told her to say that she had driven appellant home, but Monica could not recall having such a conversation with Emily. She also acknowledged that, in her statement, she did not say that appellant told her to lie.

ed on speculation grounds. The trial court sustained the objection, instructed the jury to disregard Chavez's answer, and denied appellant's motion for mistrial.

Appellant testified on his own behalf during the guilt-innocence phase. He acknowledged that he had been a member of the Latin Kings gang from 1994 to 1996, before the shooting occurred. He testified that he had never been to David Cruz's house, that he had only seen David once or twice before the shooting, that he did not give David a gun, that he never had a gun on the day of the shooting, and that he did not go to David's house after the shooting to retrieve the gun. Appellant stated that when he, Jose, and Emily arrived at David's school David showed them a gun and that David sat in the passenger seat while appellant climbed into the back of the truck with David's two friends. Appellant testified that he heard David say, "Duck, because y'all are going to see what a drive by is," and, when the shooting started, he was lying in the back of the truck, covering his head. Appellant stated that, after Jose dropped him off at his house, Jose told him that he had better not say anything, "or else." Appellant denied making threats to Jose and David. Appellant also testified that, after the shooting, he was "scared for his life," and he left Houston for Mexico and stayed there for five or six years.

At the punishment phase, the State called Harris County Sheriff's Department Deputy M. Squyres as an expert on criminal street gangs. Before Deputy Squyres testified, defense counsel objected to any testimony regarding the national criminal activities of the Latin Kings unless the State could specifically connect such activity to appellant. The trial court overruled the objection, agreeing with the State that the nature of the Latin Kings and the kinds of activities for which they are known was "highly relevant" to appellant's character. Deputy Squyres testified that the Latin Kings are known for engaging in criminal activity, specifically narcotics distribution, "random assaultive behavior against other gang members," and murder. Deputy Squyres also testified that he examined and photographed appellant's tattoos, and two of them shared characteristics with common Latin Kings gang symbols. Deputy Squyres noted that one of those tattoos was dated March 1, 2002.

The jury convicted appellant of murder and assessed punishment at thirty-five years' confinement and a $10,000 fine.

## Jurisdiction

In his first issue, appellant, who was sixteen at the time of the shooting, contends that the trial court lacked jurisdiction to hear this case because the order purportedly assuming jurisdiction from the juvenile court was defective and invalid, and, therefore, jurisdiction remained in the juvenile court. Specifically, appellant contends that the order does not meet Code of Criminal Procedure article 42.01's requirements for judgments because (1) the order is not dated, (2) the order reflects only the date on which the juvenile court waived jurisdiction, (3) the order is not file-stamped by the district clerk's office, and (4) the district court judge's signature is illegible and there is no printed name of the judge on the order.

The juvenile court may waive its exclusive original jurisdiction and transfer a child to the district court for criminal proceedings if (1) the child is alleged to have committed a felony; (2) the child was fourteen years of age or older at the time of the alleged offense if the offense is a felony of the first degree; and (3) after a full investigation and a hearing, "the juvenile court determines that there is probable cause to believe that the child before the

court committed the offense alleged and that because of the seriousness of the offense alleged or the background of the child the welfare of the community requires criminal proceedings." TEX. FAM. CODE ANN. § 54.02(a) (Vernon Supp. 2010); *see id.* § 54.02(i) ("A waiver under this section is a waiver of jurisdiction over the child and the criminal court may not remand the child to the jurisdiction of the juvenile court."); *see also Ex parte Waggoner,* 61 S.W.3d 429, 431 (Tex.Crim.App. 2001) ("In the absence of a transfer [to the district court], the district court was, at the time of the offense, without jurisdiction, and any resulting conviction is void.").

### A. Waiver Under Juvenile Code article 4.18(a)

The State contends that appellant has waived his contention that jurisdiction remained in the juvenile court because Code of Criminal Procedure article 4.18(a) provides that objections to a district court's assumption of jurisdiction over a juvenile must be made before jury selection and appellant did not so object. Under these facts, we disagree.

Article 4.18(a) provides that:

> A claim that a district court or criminal district court does not have jurisdiction over a person because jurisdiction is exclusively in the juvenile court and that the juvenile court could not waive jurisdiction under Section 8.07(a), Penal Code, or did not waive jurisdiction under Section 8.07(b), Penal Code, must be made by written motion in bar of prosecution filed with the court in which criminal charges against the person are filed.

TEX.CODE CRIM. PROC. ANN. art. 4.18(a) (Vernon 2005). If the defendant elects to have a jury trial on either guilt or punishment, the defendant must file and present his motion to the presiding judge of the court before jury selection begins. *Id.* art. 4.18(b)(2). If the defendant does not file his motion within the prescribed time limits, the defendant "may not contest the jurisdiction of the court on the ground that the juvenile court has exclusive jurisdiction." *Id.* art. 4.18(d)(1).

■ Here, appellant is not arguing that the district court lacks jurisdiction because jurisdiction was exclusively in the juvenile court and the juvenile court either could not waive jurisdiction under Penal Code section 8.07(a) or did not waive jurisdiction under Penal Code section 8.07(b). *See id.* art. 4.18(a). Instead, appellant contends that the district court lacks jurisdiction because its order assuming jurisdiction after transfer from the juvenile court was defective and invalid, and therefore void. This factual scenario is not covered by the plain language of article 4.18(a). We therefore conclude that the State's interpretation of article 4.18(a), which would require the defendant to make a written motion before jury selection begins in order to preserve any claim that the district court lacks jurisdiction, is overly broad and not supported by the language of the statute. *See Alberty v. State,* 250 S.W.3d 115, 118 (Tex.Crim.App.2008) (holding that article 4.18 applies only when jurisdiction is exclusively in juvenile court; thus, when evidence supports jurisdiction in both juvenile and district courts, article 4.18 does not apply and defendant need not make a written motion to preserve the complaint).[5] We hold that when a defendant challenges the district court's jurisdiction due to an

---

5. *See also Martinez v. State,* No. 2–02–013–CR, 2003 WL 360942, at *1 (Tex.App.-Fort Worth Feb. 20, 2003, pet. ref'd) (mem. op., not designated for publication) (holding article 4.18's preservation requirements inapplicable when defendant challenges order waiving jurisdiction as void on its face because order stated that defendant was seventeen at time of crime).

allegedly defective order assuming jurisdiction the defendant need not object via written motion before jury selection begins to preserve his complaint for appellate review. We further hold that appellant did not waive his contention that jurisdiction remained in the juvenile court by failing to object to the transfer to the district court before jury selection.

### B. Lack of District Court Jurisdiction Due to Invalid Transfer Order

■ Neither the Family Code nor the Code of Criminal Procedure specifies the required contents of the district court's order assuming jurisdiction, and neither code specifies that, if that order does not meet certain requirements, the trial court loses jurisdiction. *See Moss v. State,* 13 S.W.3d 877, 885–86 (Tex.App.-Fort Worth 2000, pet. ref'd) (holding no statutory requirement exists that transfer order be filed with district court and that, if not filed, district court deprived of jurisdiction); *see also Ellis v. State,* 543 S.W.2d 135, 137 (Tex.Crim.App.1976) ("Regardless of whether the order of the juvenile court was actually on file with the papers in the case, the record reflects that the juvenile court had waived jurisdiction over appellant and had transferred it to the district court in which all subsequent criminal proceedings were had, and that the district court had such order in its possession and acted on the waiver and transfer and assumed jurisdiction. . . .").

Here, it is undisputed that the juvenile court signed an order waiving its exclusive jurisdiction and transferring jurisdiction "to the Criminal District Court of Harris County." Appellant does not contend that this order waiving jurisdiction is invalid or that the juvenile court improperly waived and transferred its jurisdiction. The order assuming jurisdiction in the district court is included within the clerk's record, indicating that it was duly filed in the district clerk's office with the other papers in the case. The caption of the order states "In the 174 District Court of Harris County, Texas," the order is signed, and the order includes a statement that:

> IT IS ACCORDINGLY CONSIDERED, ORDERED AND ADJUDGED THAT jurisdiction of this court of said ROGELIO DELACERDA for criminal proceedings be and the same are hereby assumed by this court; that this cause be filed and docketed and this order entered in the minutes of this court, and that a certified copy of same be certified to said Judicial District Court, sitting as a Juvenile Court, for observance.

However, the order is not dated, nor does the printed name of the presiding judge appear on the order.

We conclude that, despite the lack of a date and printed name of the judge, this order unequivocally provides for the assumption of jurisdiction by the 174th District Court. *See Speer v. State,* 890 S.W.2d 87, 93 (Tex.App.-Houston [1st Dist.] 1994, pet. ref'd) (holding that, when discrepancy existed between district court number within order assuming jurisdiction, discrepancy was "no more than a typographical error or editing oversight," and district court named in caption properly assumed jurisdiction).

We hold that the district court properly assumed and exercised jurisdiction over appellant in this case.[6]

We overrule appellant's first issue.

---

**6.** Appellant contends that, for the order assuming jurisdiction to be valid, it must follow the same requirements for judgments pursuant to Code of Criminal Procedure article 42.01, and, thus, the order must be a written declaration accepting jurisdiction, signed by the trial judge, entered of record, and must demonstrate the date signed or entered of

### Commitment Question

In his second issue, appellant contends that the trial court allowed the State to ask an improper commitment question during voir dire when it sought to discover which veniremembers could not convict appellant if the State failed to produce "physical evidence" but otherwise proved the elements of the offense beyond a reasonable doubt.

The trial court has broad discretion over the process of selecting a jury. *Barajas v. State*, 93 S.W.3d 36, 38 (Tex.Crim. App.2002); *Braxton v. State*, 226 S.W.3d 602, 604 (Tex.App.-Houston [1st Dist.] 2007, pet. dism'd). We therefore review the trial court's ruling on an allegedly improper commitment question during voir dire for an abuse of discretion. *Atkins v. State*, 951 S.W.2d 787, 790 (Tex.Crim.App. 1997); *Braxton*, 226 S.W.3d at 604.

Improper commitment questions are prohibited to "ensure that the jury will listen to the evidence with an open mind— a mind that is impartial and without bias or prejudice—and render a verdict based upon that evidence." *Sanchez v. State*, 165 S.W.3d 707, 712 (Tex.Crim.App.2005). Commitment questions "require a venireman to promise that he will base his verdict or course of action on some specific set of facts before he has heard any evidence, much less all of the evidence in its proper context." *Id.; Standefer v. State*, 59 S.W.3d 177, 179 (Tex.Crim.App.2001) (holding that commitment questions "are those that commit a prospective juror to resolve, or refrain from resolving, an issue a certain way after learning a particular fact"). Not all commitment questions, however, are improper. *Standefer*, 59 S.W.3d at 181.

The Court of Criminal Appeals has articulated a three-part test for determining whether a voir dire question is an improper commitment question. *Id.* at 179–84; *Braxton*, 226 S.W.3d at 604; *Harris v. State*, 122 S.W.3d 871, 879 (Tex.App.-Fort Worth 2003, pet. ref'd). First, the trial court must determine whether the particular question is a commitment question. *Standefer*, 59 S.W.3d at 179. A question is a commitment question if "one or more of the possible answers is that the prospective juror would resolve or refrain from resolving an issue in the case on the basis of one or more facts contained in the question." *Id.* at 180. Second, if the question is a commitment question, the trial court must then determine whether it is a proper commitment question. *Id.* at 181 ("When the law requires a certain type of commitment from jurors, the attorneys may ask the prospective jurors whether they can follow the law in that regard."); *Braxton*, 226 S.W.3d at 604. A commitment question is proper if one of the possible answers to the question gives rise to a valid challenge for cause. *Standefer*, 59 S.W.3d at 182; *Braxton*, 226 S.W.3d at 604. If the question does not, then it is not a proper commitment question and it should not be allowed by the trial court. *Standefer*, 59 S.W.3d at 182. Third, if the question does give rise to a valid challenge for cause, then the court must determine whether the question "contain[s] *only* those facts necessary to test whether a prospective juror is challengeable for cause." *Id.* (emphasis in original). "Additional facts supplied beyond what is necessary to sustain a challenge for cause render improper what otherwise would have been a proper question." *Braxton*, 226 S.W.3d at 604.

record. *See* TEX.CODE CRIM. PROC. ANN. art. 42.01, § 1 (Vernon Supp. 2010). Appellant cites no authority for the contention that the requirements for the form of judgments should apply to the form of an order assuming jurisdiction from a juvenile court.

## A. Was the State's question a commitment question?

Appellant contends that the trial court improperly allowed the State to ask the veniremembers variations of the following question:

> I bring you other types of evidence. I bring you direct evidence. I bring you maybe circumstantial evidence. I bring you any other type of evidence you can think of. And I prove my case to you beyond a reasonable doubt through that evidence, but I don't bring you any physical evidence. Can you convict?

Appellant and the State agree that this question was a commitment question. This question asked veniremembers whether they could convict based upon a particular factual scenario—no physical evidence. *See Standefer,* 59 S.W.3d at 179 (holding that commitment questions commit prospective jurors to resolve issue a certain way after learning particular facts). We agree with the parties and conclude that this question was a commitment question. *Id.; see also Braxton,* 226 S.W.3d at 605 (holding that question asking whether prospective jurors would be more likely to consider self-defense just because defendant was a woman was commitment question). We therefore determine whether the commitment question was proper.

## B. Did the question give rise to a valid challenge for cause?

A veniremember may be challenged for cause if he possesses a bias against a phase of the law upon which the State or defendant is entitled to rely. *Mason v. State,* 116 S.W.3d 248, 255 (Tex. App.-Houston [14th Dist.] 2003, pet. ref'd) (citing *Barajas,* 93 S.W.3d at 39); *see* TEX. CODE CRIM. PROC. ANN. art. 35.16(b)(3) (Vernon 2006). The State may properly challenge a prospective juror for cause when the juror would hold the State to a burden higher than beyond a reasonable doubt.

*Mason,* 116 S.W.3d at 255 (citing *Coleman v. State,* 881 S.W.2d 344, 360 (Tex.Crim. App.1994)); *see also Blackwell v. State,* 193 S.W.3d 1, 20 (Tex.App.-Houston [1st Dist.] 2006, pet. ref'd) ("[A] juror who would require more evidence than necessary to prove a case beyond a reasonable doubt would be subject to a challenge for cause."); *Harris,* 122 S.W.3d at 880 ("Although the State may not bind a prospective juror to a specific set of facts, the State is permitted to determine whether a prospective juror will require evidence the law does not require to convict a defendant."). Sufficient evidence can support a murder conviction even in the absence of physical evidence such as DNA evidence, fingerprinting evidence, and the murder weapon; thus, such evidence is not required to obtain a conviction. *See Harmon v. State,* 167 S.W.3d 610, 614 (Tex. App.-Houston [14th Dist.] 2005, pet. ref'd) ("A rational jury could have found appellant guilty of aggravated robbery without DNA evidence, fingerprint evidence, or evidence of the gun or cash Newby gave to appellant.").

Here, the challenged question sought to determine whether prospective jurors could convict appellant in the absence of "physical evidence" if the State otherwise proved the elements of the offense beyond a reasonable doubt. Because the State is not required to produce such evidence to prove its case beyond a reasonable doubt, a negative answer to this question gives rise to a valid challenge for cause because it reveals a bias against a "phase of the law upon which the State is entitled to rely for conviction or punishment." *See* TEX.CODE CRIM. PROC. ANN. art. 35.16(b)(3); *Harris,* 122 S.W.3d at 880 (holding, in sexual assault case, that question asking whether jurors could convict in absence of scientific or medical evidence, was proper commitment question because State could obtain

conviction in absence of such evidence). In this situation, a juror who requires physical evidence holds the State to a higher burden than beyond a reasonable doubt, and, therefore, the State may properly challenge such a juror for cause. *See Mason*, 116 S.W.3d at 255–56 (holding question that "identified veniremen who would not convict [of aggravated sexual assault and indecency with a child] in the absence of DNA or medical evidence— even though Texas law does not require it and the State might otherwise prove its case beyond a reasonable doubt" was proper commitment question); *Harris*, 122 S.W.3d at 880 ("[T]he State is permitted to determine whether a prospective juror will require evidence the law does not require to convict a defendant.").

We therefore conclude that, because a negative answer to the State's question would lead to a valid challenge for cause, we must proceed to the third step of the inquiry—whether the question included only the facts necessary to test whether a prospective juror was challengeable for cause—to determine if this was a proper commitment question.

### C. Did the question include only necessary facts?

A commitment question may be improper if it "includes facts *in addition* to those necessary to establish a challenge for cause," and, therefore, a commitment question "must contain *only* those facts necessary to test whether a prospective juror is challengeable for cause." *Standefer*, 59 S.W.3d at 182 (emphasis in original); *Braxton*, 226 S.W.3d at 606 ("[T]he question should not contain more case-specific facts than needed to give rise to a valid challenge for cause."). In *Atkins*, for example, the Court of Criminal Appeals held that the following commitment question was improper: "If the evidence, in a hypothetical case, showed that a person

was arrested and they had a crack pipe in their pocket, and they had a residue amount in it, and it could be measured, and it could be seen, is there anyone who could not convict a person based on that— [?]" *Atkins*, 951 S.W.2d at 789. The court reasoned that this question was improper because it "serve[d] no purpose other than to commit the jury to specific set of facts prior to the presentation of any evidence at trial." *Id.*

Here, the questions asked by the State did not include facts that were unnecessary to determining a valid challenge for cause. *Braxton*, 226 S.W.3d at 606. The questions "did not attempt to commit the prospective jurors to a specific set of facts prior to the presentation of evidence at trial." *Id.* Rather, the only fact that the questions included was the absence of physical evidence, such as DNA or fingerprinting evidence, and this fact was necessary to test whether a prospective juror possessed a bias against a phase of the law upon which the State was entitled to rely, and was, therefore, challengeable for cause. *See Standefer*, 59 S.W.3d at 182; *Harris*, 122 S.W.3d at 881 ("The questions were not fact intensive, but rather only included those facts necessary to determine whether a prospective juror was challengeable for cause."). We therefore hold that, because the questions asked by the State included only the facts necessary to discover a valid challenge for cause, the questions were proper commitment questions, and the trial court did not err in allowing these questions.

We overrule appellant's second issue.

### Failure to Pronounce Exhibit Admitted

In his third issue, appellant contends that the trial court erred in failing to pronounce that Defense Exhibit 2, Jose Carreon's written police statement, was admit-

ted after it overruled the State's hearsay objection to the exhibit. Appellant argues that this failure precluded the jury from considering this exhibit during its deliberations.

During cross-examination of Jose, defense counsel attempted to impeach Jose by using his written police statement. After the State objected on the ground that counsel was improperly reading from a document not admitted into evidence, defense counsel offered the statement into evidence as Defense Exhibit 2. The State objected to the admission of this document on hearsay grounds. Defense counsel, the prosecutor, and the trial court then had the following exchange:

> [Defense]: Is the State still objecting to the introduction of the statement?
>
> [State]: Yes, of the statement.
>
> [Defense]: I'm still offering it. I'm offering it into evidence. What's the basis of the objection?
>
> [State]: Hearsay, certainly.
>
> The Court: Denied.

Appellant's interpretation of this exchange is that the trial court overruled the State's objection and admitted Exhibit 2, but failed to pronounce that it had admitted the exhibit. The State contends that the more logical interpretation is that trial court sustained its objection and "denied the admission of the statement into evidence."

Based on a review of other instances in the record in which the trial court either admitted evidence over a party's objection or excluded evidence, we agree with the State. The trial court admitted exhibits over the objection of defense counsel on five separate occasions throughout both phases of the trial. For example, when the State offered a 9mm handgun into evidence for demonstrative purposes, the following exchange occurred:

> [State]: Your Honor, at this time State would offer State's 62 in evidence for demonstrative purposes only after tendering to opposing counsel.
>
> [Defense]: Objection. Not relevant.
>
> The Court: Overruled. Entered over objection for demonstrative purposes.

Although this was the only occasion that the trial court explicitly said "overruled," on each of the other four occasions, the court said "admitted over objection." In contrast, on two occasions, defense counsel attempted to introduce the written statement of Edgar Rangel into evidence and the following occurred:

> [Defense]: For the record, now that the jury is retired, I want to reoffer Defense Exhibit Number 3, the statement of Edgar Rangel, which rebuts the witness' testimony about this witness telling him that David was the shooter.
>
> [State]: Judge, I renew the previous objections. You heard the witness' testimony. I'm sorry. Previous response. You heard the witness' testimony.
>
> The Court: Same ruling. Denied.

On both of these occasions, the trial court excluded the proffered evidence and stated "denied," which is what the court stated when defense counsel offered Jose's written statement.

When we examine the record and contrast the trial court's statements when it admitted exhibits over defense counsel's objection with its statements when it excluded exhibits, we conclude that the trial court did not admit Defense Exhibit 2 and "inadvertently" fail to state that the exhibit was admitted. We therefore hold that the trial court did not err in failing to pronounce the exhibit admitted. *See Word v. State,* 206 S.W.3d 646, 651–52 (Tex. Crim.App.2006) ("It is usually the appeal-

ing party's burden to present a record showing properly preserved, reversible error."); *Guajardo v. State*, 109 S.W.3d 456, 462 n. 17 (Tex.Crim.App.2003) ("It is, however, the appealing party's burden to ensure that the record on appeal is sufficient to resolve the issue he presents."); *Ortiz v. State*, 144 S.W.3d 225, 230 (Tex.App.-Houston [14th Dist.] 2004, pet. ref'd) ("[The appellant] is required to develop the record to show the nature and source of error and, in some cases, its prejudice to him.").

We overrule appellant's third issue.

### Characterization of Police Interview

Appellant contends, in his fourth issue, that the trial court erroneously allowed HPD Investigator H.A. Chavez to discuss his interview of appellant and to characterize that interview as "not helpful" because appellant was under the jurisdiction of the juvenile justice system at the time. Appellant argues that his statement was a product of custodial interrogation and, thus, because the police did not follow the procedures in the Family Code that govern the admissibility of statements made by minors, the trial court should not have allowed Investigator Chavez either to discuss his conversation with appellant or to testify regarding his impressions following the conversation. In his fifth issue, appellant contends that the trial court erroneously denied his motion for mistrial made after Investigator Chavez testified that, after interviewing appellant, he "felt that [appellant] possibly knew more [about the shooting] than he was telling."

#### A. Statement that Appellant's Interview was "Not Helpful"

The State did not offer, and the trial court did not admit into evidence, any portion of appellant's oral statement to Investigator Chavez. There is no indication that, during his conversation with Chavez, appellant confessed to his involvement in the shooting. Chavez did not testify that appellant's statements were "not helpful" because they were inculpatory and incriminating; rather, he testified that appellant was not "helpful in [Chavez's] investigation" of the shooting.

Former Family Code section 51.09, applicable at the time of appellant's interview, set forth certain procedural requirements that must be met for a child's statement to be admissible in evidence. Act of May 24, 1991, 72d Leg., R.S., ch. 593, 1991 Tex. Gen. Laws 2129, 2129–30 (amended 1997) (current version at Tex. Fam.Code Ann. § 51.095(a) (Vernon 2008)); *see also* Tex. Fam.Code Ann. §§ 52.02–.026 (Vernon 2008) (requiring, among other things, that person taking child into custody must "without unnecessary delay" take child to designated juvenile processing office). For example, the statute provided that, when the child is in a detention facility or in the custody of an officer, the statement must be in writing and must reflect that the child received his *Miranda* warnings from a magistrate before making the statement. Act of May 24, 1991, 72d Leg., R.S., ch. 593, 1991 Tex. Gen. Laws 2130 (amended 1997). Section 51.09(d)(2) expressly provided that it "does not preclude the admission of a statement made by the child if the statement does not stem from custodial interrogation." Act of May 24, 1991, 72d Leg., R.S., ch. 593, 1991 Tex. Gen. Laws 2129, 2129–30 (amended 1997) (current version at Tex. Fam.Code Ann. § 51.095(b)(2) (Vernon 2008)); *see also Laird v. State*, 933 S.W.2d 707, 713 (Tex.App.-Houston [14th Dist.] 1996, pet. ref'd) ("[S]ection 51.09(b)(2) of the Family Code [does] not apply to this case because appellant's confession was not made as a result of custodial interrogation.... In such a situation, section 51.09(d)(2) of the Family Code ap-

plies. This section allows an oral statement to be admitted if it is not in response to custodial interrogation."). As a threshold issue, we must first determine whether appellant was in custody when he spoke with Investigator Chavez.

Custodial interrogation is questioning that is initiated by law enforcement after a person has been taken into custody or otherwise deprived of his freedom in any significant way. *See Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 1528, 128 L.Ed.2d 293 (1994); *In re D.J.C.*, 312 S.W.3d 704, 712 (Tex.App.-Houston [1st Dist.] 2009, no pet.) (addressing whether juvenile was in custody for purpose of determining admissibility of confession in juvenile delinquency proceeding). "A custodial interrogation occurs when a defendant is in custody and is exposed 'to any words or actions on the part of the police ... that [the police] should know are reasonably likely to elicit an incriminating response.'" *Roquemore v. State*, 60 S.W.3d 862, 868 (Tex.Crim. App.2001) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980)). A child is in custody if, under the objective circumstances, a reasonable child of the same age would believe that his freedom of movement was significantly restricted. *In re D.J.C.*, 312 S.W.3d at 712 (citing *In re U.G.*, 128 S.W.3d 797, 799 (Tex.App.-Corpus Christi 2004, pet. denied) and *Jeffley v. State*, 38 S.W.3d 847, 855 (Tex.App.-Houston [14th Dist.] 2001, pet. ref'd)).

In determining whether an individual is in custody, we first examine all of the circumstances surrounding the interrogation to determine if there was a formal arrest or "restraint of freedom of movement to the degree associated with a formal arrest." *Stansbury*, 511 U.S. at 322, 114 S.Ct. at 1528–29; *In re D.J.C.*, 312 S.W.3d at 712. This determination focuses on the objective circumstances of the interrogation and not on the subjective views of either the interrogating officers or the person being questioned. *Stansbury*, 511 U.S. at 323, 114 S.Ct. at 1529; *In re D.J.C.*, 312 S.W.3d at 712. We next consider whether, in light of the particular circumstances, a reasonable person would have felt that he was at liberty to terminate the interrogation and leave. *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995); *In re D.J.C.*, 312 S.W.3d at 712. Factors relevant to a custody determination include: (1) probable cause to arrest; (2) focus of the investigation; (3) subjective intent of the police; and (4) subjective belief of the defendant. *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex.Crim.App.1996); *In re D.J.C.*, 312 S.W.3d at 712. Because the custody determination is based entirely on objective circumstances, whether the law enforcement officials had the subjective intent to arrest is irrelevant unless that intent is somehow communicated to the suspect. *Stansbury*, 511 U.S. at 323, 114 S.Ct. at 1529; *Dowthitt*, 931 S.W.2d at 254; *In re D.J.C.*, 312 S.W.3d at 713.

The following situations generally constitute custody: (1) when the suspect is physically deprived of his freedom of action in any way; (2) when a law enforcement officer tells the suspect that he cannot leave; (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; or (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave. *Dowthitt*, 931 S.W.2d at 255; *In re D.J.C.*, 312 S.W.3d at 713.

Being the focus of the investigation does not amount to being in custody. *Meek v. State*, 790 S.W.2d 618, 621 (Tex.

Crim.App.1990) (citing *Beckwith v. United States*, 425 U.S. 341, 347, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1 (1976)); *In re D.J.C.*, 312 S.W.3d at 713. Similarly, stationhouse questioning does not, in and of itself, constitute custody. *Dowthitt*, 931 S.W.2d at 255; *In re D.J.C.*, 312 S.W.3d at 713. Ordinarily, when a person voluntarily accompanies a law enforcement officer to a certain location, even though the person knows or should know that the officer suspects that he may have committed or may be implicated in the commission of a crime, the person is not restrained or "in custody." *Garcia v. State*, 237 S.W.3d 833, 836 (Tex.App.-Amarillo 2007, no pet.) (citing *Miller v. State*, 196 S.W.3d 256, 264 (Tex.App.-Fort Worth 2006, pet. ref'd)). "When the circumstances show that the individual acts upon the invitation or request of the police and there are no threats, express or implied, that he will be forcibly taken, then that person is not in custody at that time." *In re D.J.C.*, 312 S.W.3d at 713; *Garcia*, 237 S.W.3d at 836 (citing *Shiflet v. State*, 732 S.W.2d 622, 628 (Tex.Crim.App.1985)).

The only evidence in the record regarding the circumstances of appellant's interview with Investigator Chavez is Chavez's testimony. According to Investigator Chavez, HPD Homicide Division received an anonymous Crime Stoppers tip that provided appellant's name. Several officers, including Chavez, went to appellant's house on January 24, 1997, to ask him to come to the station and give a statement.

The officers discovered that appellant was only sixteen, and so they informed his mother that "[appellant's] name had come up on an investigation and advised her that [the officers] needed to speak with [appellant] about this case." Appellant's mother gave the officers permission to speak with him. The officers transported appellant to the Homicide Division. Investigator Chavez testified that they did not read appellant any *Miranda* warnings because he "wasn't in custody." When asked whether he was planning to arrest appellant on that day, Investigator Chavez responded that "[a]t that particular time, his name just came up and we wanted to see what he knew about the case." Investigator Chavez stated that he did not make a written statement or a recording of the interview because, when the witness does not have any "useful" information, normal practice is to "document [the interview] as an oral statement." After appellant gave his oral statement, Investigator Chavez had a patrol officer escort appellant to his father's business. Investigator Chavez did not testify about the contents of appellant's oral interview.

■ Based on this record, in which there is no testimony about the circumstances of the interview itself, there is no indication that appellant's freedom of movement was restrained or that he felt as though he could not terminate the interview and leave at any time.[7] *See In re D.J.C.*, 312 S.W.3d at 714 (holding that

---

7. Defense counsel made the following objection when the prosecutor first asked Investigator Chavez about whether he thought appellant was helpful in their interview: "I object to any conversation with him unless it's properly recorded according to the rules that existed then for juveniles and for criminal law and I object to the implication that he wasn't helpful but he was dishonest because they can't go into the conversation, period." After the trial court overruled this objection, Investigator Chavez testified that he did not read *Miranda* warnings to appellant because "[h]e wasn't in custody." At no point did defense counsel challenge this statement or otherwise argue and develop facts indicating that Investigator Chavez's interview of appellant constituted custodial interrogation and, therefore, the procedural protections of the Family Code should apply.

"there was restraint of freedom of movement to the degree associated with formal arrest" when magistrate read defendant his *Miranda* warnings, defendant's grandmother was excluded from interview despite her request, and defendant was alone in locked interrogation room with armed officer). Investigator Chavez testified that, at the time of the interview, appellant was not a suspect, but that his name "came up" in an anonymous tip, and therefore detectives wanted to speak with appellant and see if he knew anything about the incident. Investigator Chavez also testified that, with the permission of his mother, appellant voluntarily went with the officers to the Homicide Division office. Merely being questioned at the stationhouse, by itself, does not constitute custody. *Dowthitt,* 931 S.W.2d at 255; *In re D.J.C.,* 312 S.W.3d at 713. We conclude that appellant's oral statement to Investigator Chavez did not stem from custodial interrogation, and, therefore, was admissible in evidence. *See* Act of May 24, 1991, 72d Leg., R.S., ch. 593, 1991 Tex. Gen. Laws 2129, 2129–30 (amended 1997); *see also Laird,* 933 S.W.2d at 713 (holding section 51.09(b)(2) inapplicable when confession was not result of custodial interrogation). Because appellant's oral statement was admissible, we hold that the trial court did not abuse its discretion in allowing Investigator Chavez to testify that appellant's statement was not helpful to his investigation.

### B. Statement that Appellant "Possibly Knew More than He Was Telling"

In his fifth issue, appellant contends that the trial court erroneously denied his motion for mistrial made after Investigator Chavez testified, in response to the State's question of whether he had an indication that appellant had any knowledge of the shooting, that, after his interview with appellant, he felt "that [appellant] possibly

knew more than he was telling." The trial court sustained appellant's objection on speculation grounds and instructed the jury to disregard Chavez's statement.

When the trial court instructs the jury to disregard a question, but denies the appellant's motion for mistrial, we must determine whether the improper conduct is "so harmful that the case must be redone." *Hawkins v. State,* 135 S.W.3d 72, 77 (Tex.Crim.App.2004). In determining harm, we consider three factors: (1) severity of the misconduct; (2) measures adopted to cure the misconduct; and (3) certainty of conviction absent the misconduct. *Mosley v. State,* 983 S.W.2d 249, 259 (Tex.Crim.App.1998). Asking an improper question seldom calls for a mistrial because, in most cases, any harm can be cured by an instruction to disregard. *Russeau v. State,* 171 S.W.3d 871, 885 (Tex.Crim.App.2005) (citing *Ladd v. State,* 3 S.W.3d 547, 567 (Tex.Crim.App.1999)); *Ovalle v. State,* 13 S.W.3d 774, 783 (Tex. Crim.App.2000) ("Ordinarily, a prompt instruction to disregard will cure error associated with an improper question and answer...."). A mistrial is required "only when the improper question is clearly prejudicial to the defendant and is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors." *Russeau,* 171 S.W.3d at 885. We review the trial court's denial of a motion for mistrial for an abuse of discretion. *Id.*

Here, the State, defense counsel, and the trial court had the following exchange:

[State]: Was there any indication— again, without going into what was said, was there any indication in your meeting [with appellant] that he had any knowledge of this incident?

[Defense]: Again, calls for hearsay. The only way he can answer that is by

going into what was discussed. So, I object to it.

The Court: Overruled.

[Chavez]: He—

[State]: Again, you can't go into what he said.

[Chavez]: Right, right. I felt that he possibly knew more than he was telling, but—

[Defense]: Objection to his opinion as speculation.

The Court: Sustained.

[Defense]: Ask that it be—I'd ask we have a jury instruction.

The Court: The jury is so instructed to disregard the answer to that question.

[Defense]: Move for a mistrial.

The Court: Denied.

Although appellant contends on appeal that, in sustaining his objection to "speculation," the trial court gave an inadequate instruction that "does not admonish the jury to disregard the statements made by Officer Chavez," the record reflects that the trial court promptly instructed the jury to disregard Chavez's statement. Such an instruction generally cures any error associated with improper questions and answers. *Ovalle*, 13 S.W.3d at 783.

■ This statement was the only reference to Chavez's belief that appellant may have known more about the incident than he told the officers—the State did not emphasize this statement and it did not bring up this testimony during closing argument. Furthermore, Chavez stated that he felt that appellant "possibly" knew

more than he was telling, and thus Chavez was equivocal in his statement. Chavez further testified that, at this time, appellant was not a suspect, but was merely someone who may have had relevant information about the incident, and that appellant did not become a suspect until after Chavez spoke with Carlos Martinez and David Cruz, several days after appellant's interview.[8] We therefore conclude that Investigator Chavez's statement was not clearly prejudicial to appellant and of such character as to suggest the impossibility of withdrawing the impression produced on the jurors as to warrant a new trial. *See Russeau*, 171 S.W.3d at 885. We hold that, even if the State asked an improper question, the trial court did not abuse its discretion in denying appellant's motion for mistrial.

We overrule appellant's fourth and fifth issues.

### Statement Made During Photospread

In his sixth issue, appellant contends that the trial court erred in permitting Officer Guerrero to testify that, while viewing a photospread, Albert Contreras identified David Cruz as the person he saw in the back of the truck, after Albert had previously testified that he did not identify the person in the back of the truck when he viewed the display. Defense counsel objected to Officer Guerrero's testimony on hearsay grounds.

We review a trial court's decision to admit evidence for an abuse of discretion. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim.App.2003). A trial court abuses its

---

**8.** Because we have already held that appellant was not in custody at the time of his interview with Investigator Chavez, we conclude that Chavez's testimony does not infringe upon appellant's right to remain silent. Furthermore, although appellant argues on appeal that Chavez's testimony implicates appellant's right to remain silent, he objected in

the trial court solely on the basis that Chavez's testimony was speculative. Because appellant's argument on appeal does not comport with his trial objection, we conclude that appellant failed to preserve this contention for appellate review. *See Pena v. State*, 285 S.W.3d 459, 464 (Tex.Crim.App.2009).

discretion only if its decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim.App.2008); *Roberts v. State*, 29 S.W.3d 596, 600 (Tex.App.-Houston [1st Dist.] 2000, pet. ref'd). A trial court does not abuse its discretion if any evidence supports its decision. *See Osbourn v. State*, 92 S.W.3d 531, 538 (Tex.Crim.App. 2002). If the trial court's decision is correct on any theory of law applicable to the case, we will uphold the decision. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim.App.2009).

Hearsay is a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. TEX.R. EVID. 801(d). A statement is not hearsay if the declarant testifies at trial and is subject to cross-examination concerning the statement and the statement is one of identification of a person made after perceiving the person. TEX.R. EVID. 801(e)(1)(C); *see also Thomas v. State*, 811 S.W.2d 201, 208 (Tex.App.-Houston [1st Dist.] 1991, pet. ref'd) (holding that, under Rule 801(e)(1)(C), bolstering declarant's identification with police testimony is admissible if declarant testifies and is subject to cross-examination concerning statement). The rule only requires that the declarant testify at trial and be subject to cross-examination concerning the identification, not that the declarant actually be cross-examined about the identification. *Rodriguez v. State*, 975 S.W.2d 667, 682–83 (Tex. App.-Texarkana 1998, pet. ref'd).

Contrary to appellant's assertion on appeal, the language of Rule 801(e)(1)(C) imposes no requirement that the declarant testify at trial that he previously identified a particular person. *See* TEX.R. EVID. 801(e)(1)(C). Federal Rule 801(d)(1)(C), which is identical to its Texas counterpart,

was "intended to solve the problem of a witness who identifies a defendant before trial, but then at trial refuses to acknowledge the identification because of fear of reprisal." *United States v. Jarrad*, 754 F.2d 1451, 1456 (9th Cir.1985); *see also United States v. O'Malley*, 796 F.2d 891, 899 (7th Cir.1986) (allowing admission of prior identification evidence when witness admitted he previously identified defendant but recanted defendant's involvement in offense at trial). "Rule 801(d)(1)(C) was in part directed to the very problem here at issue: a memory loss that makes it impossible for the witness to provide an in-court identification or testify about details of the events underlying an earlier identification." *United States v. Owens*, 484 U.S. 554, 562–63, 108 S.Ct. 838, 844, 98 L.Ed.2d 951 (1988); *United States v. Brink*, 39 F.3d 419, 426 (3d Cir.1994) ("Generally, evidence is admitted under Rule 801(d)(1)(C) when a witness has identified the defendant in a lineup or photospread, but forgets, or changes, his testimony at trial."). The Rule contemplates that third parties, such as the law enforcement officer who showed the declarant the photospread, will testify to the declarant's statement of identification. *See Brink*, 39 F.3d at 426; *United States v. Kaquatosh*, 242 F.Supp.2d 562, 563 (E.D.Wis.2003) ("[T]he out-of-court identification may be introduced through the witness/declarant or through a third party witness to the identification, such as a law enforcement officer.").

Texas courts have not addressed the scope of the identification exclusion to the hearsay rule; that is, whether the rule encompasses not merely the declarant's previous identification but also the declarant's statements regarding what he observed the identified person doing. The Illinois Supreme Court, in construing a statutory exclusion to the hearsay rule substantively identical to Federal Rule

801(d)(1)(C) and Texas Rule 801(e)(1)(C), rejected an interpretation that would limit admissible testimony under the statute solely to the "actual identification" of a person, reasoning instead that "construing 'statements of identification' to include the entire identification process would ensure that a trier of fact is fully informed concerning the reliability of a witness' identification, as well as the suggestiveness or lack thereof in that identification." *People v. Tisdel,* 201 Ill.2d 210, 266 Ill.Dec. 849, 775 N.E.2d 921, 926–27 (2002); *People v. Newbill,* 374 Ill.App.3d 847, 313 Ill.Dec. 784, 873 N.E.2d 408, 413 (2007) (applying *Tisdel* ). Similarly, the District of Columbia Court of Appeals has held, under its substantively identical exception, that although "detailed accounts of the actual crime" are not admissible, the declarant's "description of the offense itself is admissible under this exception only to the extent necessary to make the identification understandable to the jury." *Brown v. United States,* 840 A.2d 82, 89 (D.C.2004); *see also Porter v. United States,* 826 A.2d 398, 410 (D.C.2003) ("Some limited reference in the identification to the criminal act is permissible."); *Johnson v. United States,* 820 A.2d 551, 559 n. 4 (D.C.2003) ("To be understandable and therefore probative, an identification must have context, and the circumstances of Heard's identification which the jury learned about from his prior statement were relevant to the identification.").

On direct examination, Albert Contreras testified that he thought he had seen the person in the back of the truck at school a few times. He stated that he did not recognize the passenger as a fellow student. The State did not ask Albert whether he viewed a photospread or whether he identified anyone in a photospread. Defense counsel then had the following exchange with Albert on cross-examination:

[Defense]: [The police] showed you some photographs of some people, just some people, I guess you don't know where they're from, but you couldn't identify any of them; is that right?

[Albert]: That's right.

. . . .

[Defense]: And you were trying to see if they were the same—if any of them were the person that was in the bed of the pickup that kept popping up?

[Albert]: Yes. I was trying to recognize if I know them.

[Defense]: Okay. And you didn't see the person or you couldn't tell if it was the person you saw popping up in the bed of the pickup truck?

[Albert]: Yes, I didn't see it.

[Defense]: Pardon?

[Albert]: I didn't see him in the photographs they showed me.

On redirect, the State asked Albert if he remembered picking out one person from the display "as a person he saw in the bed of the truck." Albert responded that he did not remember identifying the person he saw in the bed of the truck and he did not remember "picking out one person in the photographs." The next morning, the State recalled Albert and asked him if he recognized the photo display that he had viewed. Albert identified his signature on the second page of the display, next to position two, but he again testified that he did not remember identifying anyone in the photographs.

Later, the State called Officer Guerrero, who was involved in compiling the photospreads for the case. Officer Guerrero stated that the photospread used in this case contained pictures of both David Cruz and appellant. Officer Guerrero testified, without defense objection, that Albert had positively identified David Cruz. After the

State asked what Albert identified David as doing, defense counsel objected, arguing that the State had already proven the identification and that any testimony regarding Albert's further statements to Officer Guerrero constituted inadmissible hearsay. The State responded that because a picture of appellant was in the display as well, Guerrero's testimony that Albert identified David "doesn't clear up the identification," and, therefore, the testimony regarding what Albert saw David doing was necessary to avoid creating an erroneous impression with the jury that Albert identified David as the shooter. The trial court overruled the objection, and Officer Guerrero agreed with the prosecutor that "the person that Albert Contreras identified is the person he sees in the bed of the truck." Officer Guerrero testified, without objection, that Albert was not able to identify the shooter.

9. Even if the trial court erroneously overruled appellant's hearsay objection, Officer Guerrero later testified, without defense objection, that Albert identified "the number-two spot" in the photospread—David Cruz—"as the person he saw laying in the bed of the truck" and not as the shooter. "The admission of inadmissible evidence can be rendered harmless if the same or similar evidence is introduced without objection elsewhere during trial." *Elder v. State*, 132 S.W.3d 20, 27 (Tex.App.-Fort Worth 2004, pet. ref'd); *see also Valle v. State*, 109 S.W.3d 500, 509 (Tex.Crim.App. 2003) ("An error in the admission of evidence is cured when the same evidence comes in elsewhere without objection.").

10. We have implicitly endorsed this construction of Rule 801(e)(1)(C) in two previous unpublished memorandum opinions. In *Chaney v. State*, No. 01–08–00204–CR, 2009 WL 1086952 (Tex.App.-Houston [1st Dist.] Apr. 23, 2009, no pet.) (mem. op., not designated for publication), we held that trial counsel did not render ineffective assistance of counsel for failing to object to an officer's testimony that a witness recognized the defendant in a photospread as "the man who went into the

Officer Guerrero later stated that, when officers show photospreads to witnesses, and the witness makes an identification, the officer has the witness sign the display "to show that they viewed the photospread and identified a certain person." At the end of his direct examination, Officer Guerrero testified, without defense objection, that Albert identified "the number-two spot" of the photospread and that he identified this person "as the person he saw laying in the bed of the truck" and not as the shooter.[9]

We agree with the rationale of the Illinois Supreme Court and the District of Columbia Court of Appeals that limiting admissible testimony under the identification exclusion to the hearsay rule solely to the declarant's naming of the identified individual and not allowing testimony regarding what the declarant identified the individual as doing is unduly restrictive.[10] *See Tisdel*, 266 Ill.Dec. 849,

room where [the complainant] was at … shortly before the shooting." *Id.* at *10. We concluded that because the declarant testified at trial and was cross-examined regarding her previous identification, the officer's statements did not constitute inadmissible hearsay. *Id.* *Vu Tran v. State*, No. 01–97–00953–CR, 1999 WL 144045 (Tex.App.-Houston [1st Dist.] Mar. 18, 1999, no pet.) (not designated for publication), involved a similar factual situation as this case, where there was a debate regarding whether the appellant or his co-defendant was the driver of a car or the passenger/shooter, and, thus, their relative positions in the car were important. *Id.* at *4. A police officer testified that the declarant, another officer, identified the co-defendant. *Id.* The appellant objected when the State asked what the declarant identified the co-defendant as doing, and after the trial court overruled the hearsay objection, the officer testified that the declarant identified the co-defendant as the driver of the car. *Id.* We held that this statement was not hearsay under Rule 801(e)(1)(C) because the declarant testified, was subject to cross-examination, and made the statement of identification after perceiving the co-defendant. *Id.*

775 N.E.2d at 926–27 (construing "statement of identification" to include "the entire identification process"); *Brown,* 840 A.2d at 89 (holding description of offense admissible "to the extent necessary to make the identification understandable"); *Johnson,* 820 A.2d at 559 n. 4 (holding that identification "must have context" to be understandable and probative). Here, Albert testified at trial and was subject to cross-examination concerning his statements regarding identification. Under these facts, Albert's statement to Officer Guerrero that he recognized David Cruz as the person he saw in the back of the truck and not as the shooter, when appellant's picture was in the same display, was an indispensable part of his "statement of identification." We conclude that Officer Guerrero's testimony regarding Albert's identification of David as the person in the back of the truck falls within Rule 801(e)(1)(C)'s exclusion of identifications from the definition of hearsay statements. We hold that the trial court did not abuse its discretion in permitting this testimony.

We overrule appellant's sixth issue.

### Admission of Autopsy Photographs

Appellant next contends, in his seventh issue, that the trial court erred in admitting three photographs located within the file containing the victim's autopsy report because the State did not establish the proper predicate for the pictures. Specifically, appellant contends that the State failed to establish (1) that the pictures were taken of the victim at the time the medical examiner performed the autopsy; (2) that Dr. Gumpeni, the sponsoring medical examiner, took the pictures; (3) that Dr. Brown, who performed the autopsy, took the pictures; and (4) that the pictures were part of the autopsy report, because only one of the pictures displayed the autopsy case number. The photographs were admitted over appellant's objection that an improper predicate had been laid.

Before being admitted into evidence, a photograph must ordinarily be shown to be a correct representation of the subject at a given time. *Huffman v. State,* 746 S.W.2d 212, 222 (Tex.Crim.App.1988); *Quinonez–Saa v. State,* 860 S.W.2d 704, 706 (Tex.App.-Houston [1st Dist.] 1993, pet. ref'd); *see also* TEX.R. EVID. 901(a) ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."). "[T]he only identification or authentication required is that the offered evidence properly represent the person, object, or scene in question." *Quinonez–Saa,* 860 S.W.2d at 706. This requirement may be met by the photographer or "any other witness who knows the facts, even though the witness did not take the photograph himself or see it taken." *Id.; see also Hughes v. State,* 878 S.W.2d 142, 155 (Tex.Crim.App.1992) (holding that sponsoring witness not required to be present when photograph taken in order to properly authenticate). A trial judge has considerable discretion in ruling on the admission or exclusion of photographic evidence. *Quinonez–Saa,* 860 S.W.2d at 706.

In *Quinonez–Saa,* we addressed whether autopsy photographs that were not mentioned in the autopsy report were admissible as business records under Rule 803(6). The sponsoring medical examiner, who did not perform the autopsy, view the body of the deceased, or testify that the autopsy photographs were a true and accurate depiction of the body at the time of the autopsy, testified that "the business records pertaining to the autopsy of the deceased included 'any photographs that would have been taken during that autopsy report' and that these records were 'en-

tered by a person who has knowledge at or near the time that the events occurred.' " *Id.* The medical examiner also testified that he was a custodian of records for the medical examiner's office and the records were made and kept as part of the normal course of business for the office. *Id.* We thus concluded that the autopsy photographs were admissible under Rule 803(6) as part of the autopsy record. *Id.*

Here, Dr. Pramod Gumpeni, an assistant Harris County Medical Examiner, testified regarding the autopsy results. Dr. Gumpeni testified that Dr. Tommy Brown, a former medical examiner, performed the autopsy of Robert Contreras in 1997. He stated that, as an assistant medical examiner, he is a custodian of the office's records, and that autopsy reports are made at or near the time that the autopsy is conducted by the medical examiner who conducts the autopsy and the records are kept in the regular course of the office's business. Dr. Gumpeni testified that he recognized the three photographs offered by the State as photographs from Robert Contreras's autopsy and that the photographs were kept in the same file as the previously-admitted autopsy report. He further testified that pictures are "also a record that is kept with the autopsy report," that the medical examiner's office keeps records of autopsy photographs "just like [it] keeps records of the autopsy report," and that the photographs are also business records kept within the particular autopsy's file.

 We conclude that these photographs were admissible under Rule 803(6) as part of the business record of the autopsy report. *See Quinonez–Saa,* 860 S.W.2d at 706–07 ("In the instant case, the testimony adduced at trial was sufficient to show that the photographs were, like the written autopsy report, entered by a person with knowledge and kept as a normal

course of business with the medical examiner's office."). We hold that the trial court did not abuse its discretion in admitting these photographs.

We overrule appellant's seventh issue.

### Denial of Requested Accomplice Witness Instruction

In his eighth issue, appellant contends that the trial court erred in denying his requested accomplice witness instruction, which included Emily Hugo and Carlos Martinez as accomplice witnesses in addition to Jose Carreon and David Cruz, who were included in the trial court's instruction, because fact issues existed regarding whether Emily and Carlos were accomplice witnesses.

 An accomplice participates with the defendant before, during, or after the commission of the crime and acts with the required culpable mental state for the crime. *Druery v. State,* 225 S.W.3d 491, 498 (Tex.Crim.App.2007); *Paredes v. State,* 129 S.W.3d 530, 536 (Tex.Crim.App. 2004) (citing *Kutzner v. State,* 994 S.W.2d 180, 187 (Tex.Crim.App.1999)). To be considered an accomplice witness, the participation with the defendant must have involved an affirmative act that promotes the commission of the offense with which the defendant is charged. *Druery,* 225 S.W.3d at 498; *Paredes,* 129 S.W.3d at 536. A witness is not an accomplice witness merely because he or she knew of the offense and did not disclose it, or even if he or she concealed the offense. *Druery,* 225 S.W.3d at 498. Similarly, a witness's mere presence at the scene of the crime does not render that witness an accomplice witness. *Id.; Cocke v. State,* 201 S.W.3d 744, 748 (Tex.Crim.App.2006). If the witness cannot be prosecuted for the same offense with which the defendant is charged, or a lesser-included offense, the witness is not an accomplice witness as a matter of law.

*Druery,* 225 S.W.3d at 498; *Cocke,* 201 S.W.3d at 748 ("There must exist evidence sufficient to connect the alleged accomplice to the criminal offense as a 'blameworthy participant,' but whether the alleged accomplice-witness is actually charged or prosecuted for his participation is irrelevant.").

■■■ A trial court has no duty to instruct the jury that a witness is an accomplice witness as a matter of law "unless there exists no doubt that the witness is an accomplice." *Druery,* 225 S.W.3d at 498. "If the evidence presented by the parties is conflicting and it remains unclear whether the witness is an accomplice, the trial judge should allow the jury to decide whether the inculpatory witness is an accomplice witness as a matter of fact under instructions defining the term 'accomplice.'" *Id.* at 498–99; *Paredes,* 129 S.W.3d at 536 (citing *Blake v. State,* 971 S.W.2d 451, 455 (Tex.Crim.App.1998)). As with an accomplice as a matter of law, however, "there must still be some evidence of an affirmative act on the part of the witness to assist in the commission of the charged offense before such an instruction is required." *Druery,* 225 S.W.3d at 499; *see also Cocke,* 201 S.W.3d at 748 ("The trial court is not required to give the jury an accomplice-witness instruction when the evidence is clear that the witness is neither an accomplice as a matter of law nor as a matter of fact."). We review the trial court's decision to deny a requested accomplice witness instruction for an abuse of discretion. *Paredes,* 129 S.W.3d at 538; *Nelson v. State,* 297 S.W.3d 424, 428–29 (Tex.App.-Amarillo 2009, pet. ref'd).

Here, appellant contends that the following evidence raises a fact issue regarding whether Emily Hugo was an accomplice: (1) Jose was driving her truck and, therefore, "she could have stopped this thing at any time"; (2) the gun was right next to her and she made no attempt to stop appellant; (3) David Cruz made the statement, "you'll find out about a drive-by"; (4) the license plate was missing from her truck; (5) she was aware that David was being threatened at school; (6) Jose's brother washed her truck after the shooting and disposed of shell casings found in the truck; (7) she heard appellant and a group of people exchange words and gang signs but did not prevent Jose from turning her truck around and driving back toward the group; (8) she waited five days to tell her parents what happened; (9) her lawyer negotiated an immunity deal; (10) she allowed appellant to remain in her truck after the shooting for the drive back across Houston; and (11) she told her friend, who was dating appellant at the time, to say that she drove appellant home from school on the day of the shooting.

Appellant contends that the following evidence raises a fact issue regarding whether Carlos Martinez was an accomplice: (1) he saw David Cruz with a gun and knew that David had been having difficulties with classmates; (2) he heard David say "you're going to find out about a drive-by"; (3) he was hiding in the back of the truck; (4) he did not go to police and tell them what happened; and (5) when he spoke to the police, he initially identified David as the shooter, but later told the police that appellant was the shooter.

■■■ The evidence does not indicate that either Emily or Carlos "performed any affirmative act to assist in the commission of [the murder] or a lesser-included offense," or that any of their actions were made with the required culpable mental state. *See Druery,* 225 S.W.3d at 499–500; *see also Nelson,* 297 S.W.3d at 430 ("Horton's actions in assisting with the washing of the pickup truck were not done with the intent to cause Schraer's death nor with the knowledge that such an action would

cause the death of Schraer."). Merely being present at the crime, having knowledge of the planned offense but failing to disclose it, and even concealing the offense does not turn a witness into an accomplice witness. *Druery*, 225 S.W.3d at 498; *see Paredes*, 129 S.W.3d at 536 ("Although [Priscilla] may have suspected that foul play would occur when Torres arrived at her house, there is no evidence suggesting that she assisted in the preparation for or planning of the murders. Priscilla was not susceptible to prosecution for capital murder or a lesser-included offense."); *see also McCallum v. State*, 311 S.W.3d 9, 14 (Tex. App.-San Antonio 2010, no pet.) ("Any false reports given [to police] were completely disconnected from actual participation with McCallum before, during, or after the commission of the crime.").

In *Druery*, the Court of Criminal Appeals noted that assisting in the disposal of the body and the murder weapon "does not transform a witness into an accomplice witness in a prosecution for murder." 225 S.W.3d at 500. "The witness must still be susceptible to prosecution for the murder itself by having affirmatively assisting in committing the offense." *Id.; see also Paredes*, 129 S.W.3d at 537 ("Although Ayala assisted after the fact in the disposal of the bodies, he is not an accomplice as a matter of law because he is not susceptible to prosecution for capital murder."). Although Emily may have told her friend to lie and say that appellant was with her, and although Carlos, in his first statement to the police, lied and said that

David was the shooter, these are not affirmative acts "assist[ing] in the commission of" the murder. *See Kunkle v. State*, 771 S.W.2d 435, 441 (Tex.Crim.App.1986) ("In the absence of such an [affirmative] act, he cannot be an accomplice witness, even as a matter of fact."). Neither Emily nor Carlos was susceptible to prosecution for murder or a lesser-included offense of murder.

We conclude that the evidence did not raise a fact issue regarding whether Emily or Carlos engaged in an affirmative act promoting the commission of the offense or whether they acted with the required culpable mental state. We therefore hold that the trial court correctly denied appellant's requested jury instruction that included Emily and Carlos as accomplice witnesses.

We overrule appellant's eighth issue.

### Inclusion of Transferred Intent Instruction

Appellant next contends, in his ninth issue, that the trial court erred in overruling his objection to the inclusion of a transferred intent jury instruction. The instruction informed the jurors that they could find appellant guilty of murder if they believed, beyond a reasonable doubt, that appellant intentionally or knowingly shot a firearm at an unknown person, intending or knowing that serious bodily injury or death would occur to that unknown person, but instead missed and hit Robert Contreras, causing his death.[11]

11. Appellant also contends, in his ninth issue, that the trial court should not have included a transferred intent instruction in the written charge because the indictment did not allege that appellant intended to shoot an "unknown person" but instead missed and hit the victim. However, a transferred intent theory need not be alleged in the indictment as a prerequisite to the trial court including such an instruction in the charge. *See Malik v. State*, 953

S.W.2d 234, 239 (Tex.Crim.App.1997) ("[W]e recognize that measuring sufficiency [of the evidence] by the indictment is an inadequate substitute because some important issues relating to sufficiency—e.g. the law of the parties and the law of transferred intent—are not contained in the indictment."); *see also Castillo v. State*, 71 S.W.3d 812, 814 (Tex.App.-Amarillo 2002, pet. ref'd) (citing prior cases holding transferred intent "may be incorpo-

■ Texas Penal Code section 6.04(b)(2) provides that "[a] person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that a different person or property was injured, harmed, or otherwise affected." TEX. PENAL CODE ANN. § 6.04(b)(2) (Vernon 2011). "This statutory principle of 'transferred intent' is raised when there is evidence a defendant with the required culpable mental state intends to injure or harm a specific person but injures or harms a different person...." *Manrique v. State*, 994 S.W.2d 640, 647 (Tex.Crim.App.1999) (McCormick, J., concurring). A "classic example" of the application of the transferred intent doctrine is "the act of firing [a gun] at an intended victim while that person is in a group of other persons. If the intended person is killed, the offense is murder. If a different person in the group is killed, the offense is murder pursuant to Texas Penal Code § 6.04(b)(2)...." *Roberts v. State*, 273 S.W.3d 322, 330 (Tex. Crim.App.2008) (addressing transferred intent in capital murder case where requisite mental state was specific intent to kill); *Chimney v. State*, 6 S.W.3d 681, 700 (Tex. App.-Waco 1999, pet. ref'd) ("Under the statute, a defendant can be held 'criminally responsible' (i.e., guilty) for the death of another even if he did not intend to harm the victim so long as he caused the actual victim's death while acting with the intent to kill a different person."). If a defendant "intentionally discharg[es] a firearm toward a group of people," he demonstrates that "he was aware that someone could be killed or that serious bodily injury could result from his committing an act clearly dangerous to human life." *Pettigrew v.*

*State*, 999 S.W.2d 810, 813 (Tex.App.-Tyler 1999, no pet.).

Here, the written charge included an instruction that tracked the language of section 6.04(b) and contained the following application paragraph:

Now, if you believe from the evidence beyond a reasonable doubt that the defendant, Rogelio Delacerda, in Harris County, Texas, on or about the 21st day of January, 1997, did then and there unlawfully and intentionally or knowingly shoot a firearm at an unknown person, intending or knowing that serious bodily injury or death would occur to an unknown person, but instead missed an unknown person and hit Jesus Roberto Contreras, causing the death of Jesus Roberto Contreras with the use of a deadly weapon, namely a firearm, then you will find the defendant guilty of murder, as charged in the indictment.

Appellant contends that the transferred intent instruction is erroneous because the application paragraph does not name the specific person that appellant allegedly intended to harm. Appellant cites no authority to support this proposition.

It is undisputed that appellant did not know Robert Contreras and thus did not intend to kill or cause serious bodily injury to him specifically. Although appellant contends that the evidence, particularly Jose's testimony that appellant "just start[ed] randomly shooting" at the group of people that had thrown things at the truck, establishes that appellant was not shooting at a particular person but missed and hit Robert instead, he does not assert on appeal that, by shooting toward the group of boys, he lacked the intent to, at the least, cause serious bodily injury to someone in that group. *See Pettigrew*, 999 S.W.2d at 813. Murder is a "result of

---

rated in the charge though omitted from the indictment"); *In re K.W.G.*, 953 S.W.2d 483,

488 (Tex.App.-Texarkana 1997, pet. denied) (holding same).

conduct" offense, "which requires that the culpable mental state relate to the result of the conduct, i.e., the causing of the death." *Roberts*, 273 S.W.3d at 328–29 (quoting *Schroeder v. State*, 123 S.W.3d 398, 400 (Tex.Crim.App.2003)); *see also Manrique*, 994 S.W.2d at 650 (Meyers, J., concurring) ("The identity of the victim is not an element of the crime to which the culpable mental state attaches.").

 Even assuming, without deciding, that the trial court erroneously failed to name the specific intended victim in the application paragraph of the transferred intent instruction, appellant has not demonstrated harm from this failure. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim.App.1984) (requiring, when defendant objected to charge at trial, that error cause "some harm" to justify reversal). For example, appellant contends that if the State could not determine appellant's intended victim, the transferred intent instruction should have included application paragraphs for the other five potential victims walking nearby. Appellant does not contend that, had the trial court charged the jury in this particular manner, the result of the trial would have been different. Moreover, the State presented evidence that appellant opened fire on the group of boys at relatively close range and shot at least five or six times. This conduct is more than evidence of mere recklessness; it is evidence of intent to kill. *See Medina v. State*, 7 S.W.3d 633, 637 (Tex.Crim.App.1999) ("[A]ppellant is guilty of murder because he was aware that firing an automatic weapon into a crowd of people was, by the nature of the conduct, reasonably certain to result in death."); *Vuong v. State*, 830 S.W.2d 929, 934 (Tex. Crim.App.1992) ("Appellant's use of a deadly weapon in a tavern filled with patrons supplies ample evidence for a rational jury to conclude beyond a reasonable doubt that Appellant had the requisite intent to kill."); *see also Ishmael v. State*, 688 S.W.2d 252, 258 (Tex.App.-Fort Worth 1985, pet. ref'd) ("When a person fires a gun into a crowd of people with no particular intended victim, the probability that serious bodily injury will result is so great that it is worse than reckless disregard of the consequences; if a death is thus caused, it is murder.").

We overrule appellant's ninth issue.

## Statements Not Introduced in Evidence Mentioned in Closing

In his tenth issue, appellant contends that the trial court erroneously denied his motion for mistrial on improper argument grounds made after the State mentioned a hearsay statement of Tommy Barron, not introduced into evidence, in its closing argument.

 Proper jury argument falls within four general categories: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to argument of opposing counsel, and (4) plea for law enforcement. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex.Crim.App.2000). Even if an argument does not fall within one of these four categories, the argument will not constitute reversible error unless, in light of the record as a whole, the argument is "extreme or manifestly improper" or "injects new facts harmful to the accused into the trial proceeding." *Id.*; *Hawkins*, 135 S.W.3d at 77–82. We conduct a harm analysis in light of any curative instructions given by the trial court. *Hawkins*, 135 S.W.3d at 77. Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required. *Id.* We review the trial court's refusal to grant a mistrial for an abuse of discretion. *Id.* (citing *Simpson v. State*, 119 S.W.3d 262, 272 (Tex.Crim.App.2003)); *see also Archie v. State*, 340 S.W.3d 734,

738–39 (Tex.Crim.App.2011) (holding that, when trial court sustains objection and gives instruction to disregard, only adverse ruling is denial of motion for mistrial, which we review for abuse of discretion).

 When determining whether a trial court abused its discretion in denying a mistrial on improper argument grounds, we apply the factors articulated in *Mosley v. State:* (1) severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks); (2) measures adopted to cure the misconduct (efficacy of any cautionary instruction by the judge); and (3) certainty of conviction absent the misconduct (strength of evidence supporting the conviction). *Mosley,* 983 S.W.2d 249, 259 (Tex.Crim.App.1998); *see also Archie v. State,* 221 S.W.3d 695, 700 (Tex. Crim.App.2007). "Mistrial is the appropriate remedy when . . . the objectionable events 'are so emotionally inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant.'" *Archie,* 340 S.W.3d at 738 (quoting *Young v. State,* 137 S.W.3d 65, 71 (Tex.Crim.App.2004)).

Here, the State made the following argument during closing:

> [State]: Well, let's talk about the people who were in the car that day. We didn't hear from Tommy Barron. You know that Tommy Barron is deceased, but you heard from Officer Chavez and we know that Tommy Barron says he was in the bed of the truck with Carlos and David.

[Defense]: Objection, Your Honor. That's outside of the record. .

[State]: Officer Chavez testified as to identification.

[Defense]: Objection, it's outside of the record.

The Court: Sustained.

[Defense]: Ask for a jury instruction.

The Court: The jury is so instructed.

[Defense]: Move for a mistrial.

The Court: Denied.

Both Carlos and David testified that Tommy Barron was in the back of the truck with them; however, Investigator Chavez did not testify that Tommy told him that he was in the back of the truck with Carlos and David. Appellant is therefore correct that this argument is outside of the record, and, thus, this remark does not fall within a permissible category of jury argument.

We disagree, however, with appellant's contention that this argument is so manifestly improper that a new trial is warranted. One of the critical contested issues at trial was whether appellant was sitting in the front passenger seat and David was in the back of the truck or whether David was in the front seat, and thus was the shooter, and appellant was in the back. The prosecutor's statement that Tommy told Investigator Chavez that he was in the back of the truck with Carlos *and David* supports the first alternative. In most instances, an instruction to disregard the State's remarks will cure the error. *Wesbrook,* 29 S.W.3d at 115. The trial court gave a jury instruction immediately following the State's remarks, and we presume that juries obey instructions to disregard.[12]

12. On appeal, appellant contends that the trial court's instruction was inadequate because "it does not admonish the jury to disregard the statements made by the State." Here, appellant made the following request: "Ask for a jury instruction." The trial court responded: "The jury is so instructed." When defense counsel asks for a particular instruc-tion "and the trial court accedes to the request by saying 'the jury is so instructed,' that instruction will in most cases be considered effective to cure the harm from an improper argument." *Hawkins v. State,* 135 S.W.3d 72, 84 (Tex.Crim.App.2004). Furthermore, appellant made no complaint at trial that the instruction was inadequate to cure any preju-

*Id.* at 116 ("[T]he prosecutor's comment was quickly followed by an instruction to disregard from the trial court which we presume was complied with by the jury."). When the trial court gives a curative instruction, only "offensive or flagrant error" warrants a reversal. *See id.* Here, the prosecutor's brief comment that Tommy told Investigator Chavez that he was in the bed of the truck with Carlos and David is not so "offensive and flagrant" that the trial court's instruction was ineffective. *See id.; see also Archie,* 340 S.W.3d at 741 ("[T]he improper questions posed by the prosecutor in this case [to the defendant during closing argument] . . . were not so indelible that the jury would simply ignore the trial court's specific and timely instruction to disregard them.").

Furthermore, in determining whether the trial court abused its discretion in denying appellant's motion for mistrial, we look to the certainty of conviction absent the misconduct. *See Archie,* 340 S.W.3d at 741–42. Here, both Carlos and David testified that Tommy was in the back of the truck with them. Albert Contreras identified David, someone whom he had seen "a few times" around school, as the person he saw in the bed of the truck, and he testified that he did not recognize the passenger as a fellow student. Carlos, David, Jose, and Emily all testified that appellant sat in the front seat and that he was the shooter. Gene Cantu testified that he recognized the person in the back of the truck, who did not have a gun, as someone he went to school with. Raul Rodriguez identified appellant at trial as the shooter.

dice arising from the prosecutor's statement. *See Lucero v. State,* 246 S.W.3d 86, 102 n. 21 (Tex.Crim.App.2008) ("Appellant claims on appeal that the trial court's instruction to disregard was 'tepid' and 'not forceful enough to cure the error.' The record, however, reflects that appellant made no such claim at

We conclude that strong evidence supports appellant's conviction. Based on the evidence presented, the jury "would almost surely have convicted the appellant regardless of" the prosecutor's brief comment during closing argument that Tommy Barron told Investigator Chavez that he was in the back of the truck with Carlos and David. *See id.* We therefore hold that the trial court did not abuse its discretion when it denied appellant's motion for mistrial following the State's remarks regarding Tommy Barron's alleged statements to Investigator Chavez.

We overrule appellant's tenth issue.

### Testimony Regarding Criminal Activity of Latin Kings

Appellant next contends, in his eleventh issue, that the trial court erroneously permitted Deputy Squyres to testify during the punishment phase of the trial regarding the organizational structure and national criminal activities of the Latin Kings gang without specifically connecting such testimony to appellant. In his twelfth issue, appellant contends that the trial court erroneously denied his motion for mistrial, made during the State's closing argument in the punishment phase when the prosecutor referred to the criminal activities of the Latin Kings gang without connecting such activity to appellant. We consider these issues together.

The trial court has broad discretion in determining the admissibility of evidence presented at the punishment phase of the trial. *Flores v. State,* 125 S.W.3d 744, 746 (Tex.App.-Houston [1st

trial. In addition, appellant's argument that the trial court's instruction to disregard 'was not forceful enough to cure the error' effectively concedes that any prejudice in the argument was curable by an instruction to disregard.").

Dist.] 2003, no pet.). Under Code of Criminal Procedure article 37.07, section 3(a)(1), the State may offer evidence "as to any matter the court deems relevant to sentencing, including but not limited to ... [the defendant's] character...." TEX.CODE CRIM. PROC. ANN. art. 37.07 § 3(a)(1) (Vernon Supp. 2010). At the punishment hearing, relevant evidence is that which "assists the fact finder in determining the appropriate sentence given the particular defendant in the circumstances presented." *Flores,* 125 S.W.3d at 746; *Garcia v. State,* 239 S.W.3d 862, 865 (Tex.App.-Houston [1st Dist.] 2007, pet. ref'd) ("Relevance in this context is more a matter of policy than an application of Rule of Evidence 401; it fundamentally consists of what would be helpful to the jury in determining the appropriate punishment.") (citing *Mendiola v. State,* 21 S.W.3d 282, 285 (Tex.Crim. App.2000)). Even relevant evidence may, however, be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See Flores,* 125 S.W.3d at 746; TEX.R. EVID. 403. We will not disturb the trial court's determination regarding the admissibility of relevant evidence unless the appellant demonstrates an abuse of discretion. *Flores,* 125 S.W.3d at 746.

■■■■ As a general rule, testimony regarding the defendant's affiliation with a gang is relevant and admissible at the punishment phase to show the defendant's character. *Garcia,* 239 S.W.3d at 866–67. Evidence of gang membership alone, however, "may not be enough for the jury to make an informed decision of appellant's character." *Beasley v. State,* 902 S.W.2d 452, 456 (Tex.Crim.App.1995). Instead,

> [i]t is essential for the jury to know the types of activities the gang generally engages in so that they can determine if his gang membership is a positive or negative aspect of his character, and

subsequently his character as a whole. Only after the jury has been provided with this information can there be a fair evaluation of how gang membership reflects on the gang member's character. *Id.; see Anderson v. State,* 901 S.W.2d 946, 950 (Tex.Crim.App.1995) ("Although relevant, gang membership alone would be meaningless to a jury which has no knowledge of the gang's purpose or activities."). It is not necessary to link the defendant to the bad acts or misconduct generally engaged in by the gang members, so long as the jury is (1) provided with evidence of the defendant's gang membership, (2) provided with evidence of the character and reputation of the gang, (3) not required to determine if the defendant committed the bad acts or misconduct, and (4) only asked to consider reputation or character of the accused. *Beasley,* 902 S.W.2d at 457; *Garcia,* 239 S.W.3d at 867. Article 37.07 explicitly allows the introduction of evidence of gang membership "even without satisfying the requirements set forth in *Beasley." Sierra v. State,* 266 S.W.3d 72, 79 (Tex.App.-Houston [1st Dist.] 2008, pet. ref'd) (holding evidence of gang membership admissible even when trial court did not instruct jury on last two *Beasley* factors).

Here, Deputy Squyres testified as an expert on criminal street gangs. Appellant admitted that he was a member of the Latin Kings gang from 1994 to 1996, and Squyres, who photographed appellant's tattoos, testified that at least two of appellant's tattoos suggested membership in the Latin Kings and that one of those tattoos was dated March 2002. Deputy Squyres also testified that the Latin Kings is a very large gang and is known for engaging in criminal activity such as "narcotics distribution, random assaultive behavior against other gang members," and murder. Defense counsel objected to such testimony

"unless it's tied to this defendant somehow."

Appellant's membership in the Latin Kings and the specific kinds of criminal activities in which its members engage is the type of relevant character evidence that is permissible during the punishment phase. *See Garcia*, 239 S.W.3d at 866 (allowing expert testimony that gangs to which appellant belonged were involved in drive-by shootings, robberies, murders, home invasions, prostitution, narcotics, car thefts, and graffiti); *Ho v. State*, 171 S.W.3d 295, 305 (Tex.App.-Houston [14th Dist.] 2005, pet. ref'd) ("Even if appellant was no longer affiliated with the gang at the time of the shooting, evidence that he was a gang member is relevant—and thus admissible at punishment—because it relates to his character."). The State may offer this evidence without linking the bad acts and misconduct engaged in by the gang's members specifically to the appellant. *See Beasley*, 902 S.W.2d at 457. Appellant admitted his gang membership. Deputy Squyres testified regarding the character of the Latin Kings. The jury was not required to determine if appellant committed any bad acts or misconduct generally attributable to Latin Kings members. And the jury was not asked to consider the evidence for any purpose other than appellant's reputation and character. *See id.* We therefore hold that the trial court did not abuse its discretion in allowing Deputy Squyres' testimony regarding the organizational structure and national criminal activities of the Latin Kings.

Appellant additionally contends, in his twelfth issue, that the trial court erroneously denied his motion for mistrial made during closing argument in the punishment phase when the State referred to the criminal activities of the Latin Kings and called appellant a "gangster."

As we have already discussed, two permissible categories of jury argument are (1) summation of the evidence and (2) reasonable deduction from the evidence. *Wesbrook*, 29 S.W.3d at 115. Even if an argument does not fall within a category of permissible jury argument, the argument will not constitute reversible error unless, in light of the record as a whole, the argument is "extreme or manifestly improper" or "injects new facts harmful to the accused into the trial proceeding." *Id.; Hawkins*, 135 S.W.3d at 77–82. We conduct a harm analysis in light of any curative instructions given by the trial court. *Hawkins*, 135 S.W.3d at 77. We use a modified version of the *Mosley* harm analysis in evaluating the harm arising from improper jury argument during the punishment phase and balance three factors: (1) severity of the misconduct (prejudicial effect); (2) curative measures; and (3) the certainty of the punishment assessed absent the misconduct (likelihood of the same punishment being assessed). *Id.* (citing *Martinez v. State*, 17 S.W.3d 677, 693–94 (Tex.Crim.App.2000)). Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required. *Id.* We review the trial court's refusal to grant a mistrial for an abuse of discretion. *Id.* (citing *Simpson*, 119 S.W.3d at 272).

The State made the following argument during the punishment phase:

> You have a Latin Kings gang member. You heard from Deputy Squyres. Latin Kings are one of the largest criminal street gangs in the United States. Not only a national gang, but a worldwide gang. A gang that's known for selling drugs. A gang that's known for murder. You have a gangster.

Defense counsel objected and requested a jury instruction. After the trial court instructed the jury to disregard the State's

remarks, defense counsel moved for a mistrial.

As we have already held, testimony regarding the defendant's gang membership and the criminal activities of that gang is permissible character evidence during the punishment phase that is relevant to assisting the jury in determining the appropriate punishment, and the State need not specifically link the activities of the gang to the defendant. *Beasley*, 902 S.W.2d at 456–57; *Garcia*, 239 S.W.3d at 866–67. Deputy Squyres permissibly testified regarding the Latin Kings and the activities for which they are known, such as narcotics distribution, "random assaultive behavior," and murder, and the State was not required to link the gang's general activities specifically to appellant. The State's argument concerning the criminal activities of the Latin Kings is, thus, a summation of the evidence presented in the punishment phase and falls within a permissible category of jury argument. *See Wesbrook*, 29 S.W.3d at 115.

Furthermore, not only did Deputy Squyres testify that appellant's tattoos indicated that he had been a member of the Latin Kings, appellant himself admitted that he had been a member. A "gangster" is defined as a "member of a gang of criminals." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 515 (11th ed. 2003). By his own admission, appellant was a member of a criminal gang, and therefore the prosecutor's characterization of appellant as a "gangster" is a reasonable deduction from the evidence.[13] *See Wesbrook*, 29 S.W.3d at 115. We conclude that the State's arguments were proper, and we therefore hold that the trial court did not abuse its discre-

tion in denying appellant's motion for mistrial.

We overrule appellant's eleventh and twelfth issues.

## Conclusion

We affirm the judgment of the trial court.

---

13. Right after this exchange, the State made the following argument: "He gets a gang tattoo on his back in 2002, years after he killed that innocent young man. He is still a gang member. Now he cleans up nice, but he is a gangster. That's the type of person that you have before you." Appellant did not object to this argument.