# NO. 12-16-00011-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *CARLTON RAY CHAMPION, JR.,* *APPELLANT* | § | *APPEAL FROM THE 114TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,* *APPELLEE* | § | *SMITH COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Carlton Ray Champion, Jr. appeals from his conviction for murder.  In one issue, he challenges the sufficiency of the evidence to corroborate testimony from a jailhouse informant. We affirm.

## BACKGROUND

The State charged Appellant with the murder of Tyrone Underwood.  Alvin Harold testified that sometime after 2:00 a.m. on January 26, 2015, he heard two to three gunshots in the vicinity of 24th Street near his home, followed by a loud crash.  Harold testified that 24th Street leads directly to Texas College and that it takes around five minutes to ride a bicycle from his home to the campus.  Laketha Alexander testified that around 2:30 a.m., she contacted 9-1-1 after her grandchildren heard the gunshots.  She also resides near Texas College.

When Officer Joshua Smedley with the Tyler Police Department arrived at 24th Street, he found Underwood deceased in the driver's seat of his wrecked vehicle.  Underwood had $180 inside his cell phone case and $16 in his center console.  Smedley and Officer Brandon Lott, also with the Tyler Police Department, testified that the vehicle had been struck by bullets. Officers found red paint flakes, which matched Underwood's vehicle, and shell casings in the driveway of a house not far from the crime scene.  Underwood apparently tried to drive away, but his injuries

prevented him from maintaining control of the vehicle. Lott testified that the shell casings indicate the shooter was near the driveway when firing. Smedley testified that the shooter could have been inside or outside the vehicle. Lott saw a significant amount of blood in the vehicle, and he testified that it appeared Underwood tried to exit the vehicle.

Investigator Donald Malmstrom with the Tyler Police Department found three bullet holes in the vehicle. He and Investigator Craig Williams with the Tyler Police Department testified that shots were fired from the passenger's side of the vehicle. Williams testified that the shooter could have been firing from the car door without any blood traveling back onto the shooter. He explained that the chances of being spattered with blood would increase if the shooter were closer to Underwood when firing.

Dr. Stephen Hastings, who conducted Underwood's autopsy, testified that Underwood sustained gunshot wounds to the right shoulder, the anterior left shoulder, the back of the right forearm, and the palm of the left hand. The wound to the right arm passed through Underwood's ribs and thoracic vertebrae, caused a contusion to his left lung, and punctured his right lung. This gunshot wound was fatal, causing Underwood's blood loss. Dr. Hastings further testified that Underwood would have lost consciousness in under ten minutes. He opined that, unless other evidence showed differently, it appeared that the shooter was more than three feet from Underwood when firing.

Detective Dennis Matthews with the Tyler Police Department testified that Underwood's cell phone contained communications with George Thomas. Underwood and Thomas met through a dating website, but never met in person. Detective Nathan Elliott with the Tyler Police Department testified that, early on January 25, Underwood and Thomas discussed meeting, but made no official plans. According to their texts, Thomas wanted Underwood to come to his home in North Tyler. Although Thomas lived near the crime scene, Elliott did not find evidence indicating that the men exchanged addresses. Elliott testified that the conversation ended around 2:30 a.m. on January 25. On January 26, around 1:00 a.m., Thomas texted Underwood, but received no response.

When asked if Thomas had tried to get money from Underwood, Detective Matthews testified that Thomas's roommate had mentioned something about money. Matthews described Thomas as surprised and taken off guard when he learned of Underwood's death. Thomas cooperated with officers, allowed them to access his cell phone, and gave officers a DNA

sample. The record suggests that Thomas may have moved out of state sometime after the murder. Detective Elliott testified that Thomas denied involvement in the murder and was cleared of any wrongdoing.

Detective Andy Erbaugh with the Tyler Police Department testified that Underwood's roommates told him that Underwood was a transgender woman and was dating "Carlton," who played football for Texas College. Underwood was also known as "Tyra." Officers testified that Texas College was near the crime scene. Mercy Seidu, Underwood's friend, testified that Underwood always talked about Appellant, but never mentioned Thomas. Kedrick Darks, Underwood's roommate, testified that Appellant and Underwood were in a relationship. He once met Appellant at Underwood's apartment, but he knew that Appellant had been there on other occasions. Darks testified that Appellant and Underwood deleted their dating profiles, but Appellant later reactivated his profile. Darks believed that Underwood had begun distrusting Appellant and that the two had an argument. He never heard Underwood mention Thomas.

Investigator Jamie Tarrant with the Tyler Police Department testified that messages between Appellant and Underwood indicated that, in the hours leading up to the murder, Underwood confronted Appellant about having a profile on a dating website. Underwood seemed angry. In a text sent on January 26 around 2:00 a.m., Appellant told Underwood to meet him on 25th Street. Tarrant testified that 25th Street is a block from Appellant's dorm. After Underwood told Appellant that he was on his way, Appellant responded that he was about to walk towards 25th Street. Texts indicate that Underwood arrived first, told Appellant that he was there, and said, "[Y]ou should [have] been here." Appellant said, "I'm leaving now." Underwood threatened to come to the school, but Appellant said, "No you not chill" and Underwood replied, "K." The conversation ended around 2:06 a.m. and there are no further texts between them.

Detective Matthews testified that campus video cameras showed Appellant leaving his dorm room and walking through the lobby around 2:13 a.m. Tarrant testified that it would take a minute or two to walk to 25th Street and another minute to drive from there to 24th Street. Elliott testified that it would take three to four minutes to run to the dorm from where the shell casings were found. Matthews testified that campus video cameras showed Appellant returning to his room around 2:27 a.m. Appellant wore a camouflage jacket and dark colored pants, shoes, and a hat. Matthews believed that Appellant could have left the campus without being seen.

3

Investigator Tarrant testified that he found no evidence showing that Underwood and Appellant actually met, but that the text conversation shows that Appellant was in the same area at the same time as the murder.

On January 26, during his first interview with officers, Appellant admitted knowing Underwood and communicating with him through "Kik," a texting application. He claimed that he met Underwood for the first time around two weeks before the murder, and that they met only one other time after that. He told officers that Underwood drove a white vehicle. He did not mention a red vehicle. He knew Underwood as Tyra, but acted as though he did not know Underwood was a male. He claimed that his DNA would not be found in Underwood's vehicle and that he had never been to Underwood's apartment. Appellant stated that he last communicated with Underwood around 11 p.m. on January 25. He told officers that he was supposed to meet Underwood, but he fell asleep and never left the dorm. When Detective Elliott asked to see Appellant's tablet, Appellant told Elliott that he had deleted the Kik application. The application was deleted about thirty minutes before the interview. Elliott also noticed that someone used the tablet around 2:47 a.m., even though Appellant claimed that the battery had died.

A witness told officers that, on January 27, she saw an African-American male kicking leaves in a vacant lot near the crime scene. The witness thought the man appeared to be looking for something. Officers searched the lot, but found nothing. That same day, officers searched Appellant's dorm room. Detective Matthews described Appellant as "very defensive," which included yelling and cursing. Appellant told officers that he last spoke with Underwood around 9:30 p.m., just before his tablet's battery died.

Detective Elliott testified that Appellant never admitted leaving his dorm, being in Underwood's vehicle, or having a sexual relationship with Underwood. He testified that the texts between Appellant and Underwood reflect a relationship that was falling apart. Elliott believed that Appellant did not want anyone knowing about his relationship with Underwood.

Jennifer Smith, a DNA analyst, testified that Appellant was the major contributor of DNA found on the passenger's side seatbelt and an inside door latch handle of Underwood's vehicle. Officers tested Appellant's camouflage jacket for lead, but the test was negative.

Ladarius Harris, who was in jail for burglary of a habitation, testified that he knew Underwood. One day, he saw Appellant in the jail's recreation yard and perceived an

opportunity to obtain justice for Underwood's family. He asked Appellant if he was the one who people said killed Underwood. Appellant replied, "Yeah, that's what they saying." Appellant told Harris that police had nothing on him and all the evidence against him was circumstantial. When Harris asked Appellant if he did "it," Appellant responded with "Yeah, you know, we had problems." He also told Harris that he knew Underwood was transgender, but did not want to discuss it. Harris admitted sending a letter to Detective Elliott, in which he mentioned possibly receiving assistance with the charges pending against him. He denied being promised anything in return for his testimony, and testified that he knew not to expect assistance with his pending criminal charges.

At the conclusion of trial, the jury found Appellant guilty of murder and assessed punishment of imprisonment for life.

**SUFFICIENCY OF CORROBORATION EVIDENCE**

In his sole issue, Appellant contends that his confession to Harris was not sufficiently corroborated. Appellant argues that, absent Harris's testimony, the verdict cannot be supported because (1) no blood was found on his clothing; (2) no weapon was ever recovered; (3) the record does not show when his DNA was left in Underwood's vehicle; (4) no fingerprints or physical evidence placed him at the crime scene; (5) he could not have completed the murder in the fifteen minutes that he was gone from his dorm room; and (6) Underwood was communicating with Thomas, who lived near the crime scene. According to Appellant, the record is insufficient to support the jury's "finding that Appellant is himself specifically connected to the actual commission of the offense."

**Standard of Review and Applicable Law**

"A defendant may not be convicted of an offense on the testimony of a person to whom the defendant made a statement against the defendant's interest during a time when the person was imprisoned or confined in the same correctional facility as the defendant unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed." TEX. CODE CRIM. PROC. ANN. art. 38.075(a) (West Supp. 2016). Corroboration is insufficient when it shows only that the offense was committed. *Id*. art. 38.075(b). A complaint challenging the sufficiency of corroboration evidence is not the same as a challenge to the legal sufficiency of the evidence to support the verdict as a whole. *Cathey v. State*, 992 S.W.2d 460,

5

462-63 (Tex. Crim. App. 1999); *Simmons v. State*, 205 S.W.3d 65, 72 (Tex. App.—Fort Worth 2006, no pet.).

When reviewing the sufficiency of corroboration evidence, we eliminate the jailhouse informant's testimony and consider the remaining evidence to determine whether it connects the accused to commission of the offense. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011); *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). The sufficiency of corroboration evidence is judged according to the facts and circumstances of each case. *Smith*, 332 S.W.3d at 442. The corroborating evidence need not prove the accused's guilt beyond a reasonable doubt. *Malone*, 253 S.W.3d at 257. Rather, direct or circumstantial corroboration is sufficient when it shows that rational jurors could find that it sufficiently tends to connect the accused to the offense. *Smith*, 332 S.W.3d at 442. If there are "conflicting views of the evidence—one that tends to connect the accused to the offense and one that does not—we will defer to the factfinder's resolution of the evidence." *Id*. It is inappropriate for an appellate court to independently construe corroboration evidence. *Id*.

**Analysis**

The accused's presence at or near the crime scene at or about the time of the offense, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration. *Malone*, 253 S.W.3d at 257. Appellant, whose dorm was located in close proximity to the crime scene, specifically told Underwood to meet him on 25th Street, and the record indicates that Underwood arrived at the designated meeting place. Although outdoor security cameras were not recording at the time, indoor cameras showed Appellant leaving his dorm only minutes after telling Underwood that he was heading toward 25th Street. After Underwood's brief response to Appellant's text that he was leaving the dorm, there are no further texts between them. The jury heard Investigator Tarrant testify that the texts placed Appellant in the same area at the same time as the murder. An accused's proximity to the crime scene is a factor that tends to establish guilt. *See Wolfe v. State*, 917 S.W.2d 270, 275 (Tex. Crim. App. 1996).

The record also contains evidence of suspicious circumstances. An accused's attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to law enforcement are probative of wrongful conduct and are circumstances of guilt. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). The jury heard evidence that Appellant claimed he

6

did not have a sexual relationship with Underwood, when text messages showed otherwise. Appellant denied leaving his dorm, but campus security cameras showed Appellant leaving his room. Appellant also denied visiting Underwood's apartment and claimed his DNA would not be found in Underwood's vehicle. However, the jury heard evidence that Appellant's DNA was in the vehicle and that he visited Underwood's apartment on more than one occasion. Appellant also gave officers conflicting stories regarding the time when he last spoke to Underwood. Additionally, officers discovered activity on Appellant's tablet during a time when Appellant claimed the tablet's battery was dead. The jury also heard evidence that, approximately thirty minutes before meeting with officers, Appellant deleted the very application that he used to converse with Underwood.

Additionally, "[m]otive is a significant circumstance indicating guilt." *Id*. The record contains evidence suggesting that Underwood was upset and had begun to distrust Appellant. Investigator Tarrant testified that the relationship appeared to be falling apart. Detective Elliott opined that Appellant did not want anyone knowing about his relationship with Underwood. In fact, Appellant initially acted as though he was unaware that Underwood was male. Although Appellant maintains that he was not absent from his dorm room long enough to commit the murder, the jury could reasonably infer that Appellant, a college athlete who lived near the crime scene, had the motive and opportunity to murder Underwood.

The State was not required to provide physical evidence of Appellant's guilt. *See Delacerda v. State*, 425 S.W.3d 367, 382 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). Even so, Appellant's DNA was found in the same vehicle in which Underwood was shot. Although Smith, the DNA analyst, could not say when the DNA was deposited, the presence of Appellant's DNA in Underwood's vehicle is still indicative of guilt. *See Rivera v. State*, 89 S.W.3d 55, 60 (Tex. Crim. App. 2002) (while the presence of DNA could indicate guilt, the absence of DNA does not indicate innocence); *see also Hardge v. State*, No. 01-11-01112-CR, 2013 WL 4680403, at *7 (Tex. App.—Houston [1st Dist.] Aug. 29, 2013, pet. ref'd) (mem. op., not designated for publication) (although analyst could not determine precisely when appellant deposited the DNA, jury could infer that appellant left his DNA at the crime scene at or near time of murder). The jury could reasonably infer that Appellant left his DNA in the vehicle at or near the time he shot Underwood. *See Hardge*, 2013 WL 4680403, at *7.

Regarding Thomas as the potential perpetrator, the jury heard evidence of his connection to Underwood, including his residence near the crime scene, his attempts to get Appellant to visit him, the possibility that he may have sought money from Underwood, and evidence that he may have moved out of state. The jury also heard evidence that Thomas was cleared of any wrongdoing. As factfinder, the jury was entitled to reject any notion that Thomas may have been involved in the murder. *See Smith*, 332 S.W.3d at 442.

Contrary to Appellant's contention, the inculpatory evidence raises more than a mere suspicion of Appellant's guilt. *See Winfrey v. State*, 393 S.W.3d 763, 771 (Tex. Crim. App. 2013). Rational jurors could find that the inculpatory evidence sufficiently tends to connect Appellant to the offense. *See Smith*, 332 S.W.3d at 442. We overrule Appellant's sole issue.

## DISPOSITION

Having overruled Appellant's sole issue, we ***affirm*** the trial court's judgment.

**BRIAN HOYLE**
Justice

Opinion delivered August 24, 2016.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**AUGUST 24, 2016**

**NO. 12-16-00011-CR**

**CARLTON RAY CHAMPION, JR.,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 114th District Court

of Smith County, Texas (Tr.Ct.No. 114-0494-15)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*