**Affirmed and Opinion Filed July 16, 2018**



**In The**

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-17-00016-CR**

**MARKAILON ADRELL DAILEY, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 5**
**Dallas County, Texas**
**Trial Court Cause No. F13-45287-L**

## MEMORANDUM OPINION

Before Justices Francis, Fillmore, and Whitehill
Opinion by Justice Whitehill

A jury convicted appellant of murder and assessed punishment at fifty-five years imprisonment.

Four of appellant's issues argue that the charge was erroneous because: (i) the self-defense instruction followed the murder and transferred intent application paragraphs; (ii) self-defense and culpable mental state instructions were not included in the transferred intent application paragraph; (iii) the self-defense instruction did not include murder committed under penal code §19.02(b)(2), and (iv) the self-defense instruction referenced but did not provide the elements for robbery or aggravated robbery or apply them. Appellant's fifth issue argues that the prosecutor made an improper argument that violated his "constitutional right to be presumed innocent."

We conclude the charge was not erroneous because of the order in which the instructions were given or by failing to include self-defense or mental state instructions in the transferred intent paragraph. Although the court erred by failing to include §19.02(b)(2) murder and the elements of robbery and aggravated robbery in the self-defense instruction, appellant did not suffer egregious harm. Finally, we conclude that appellant's complaint about improper argument was not preserved for our review; and, even had it been preserved, the argument was not a willful and calculated effort to deprive appellant of a fair trial that caused him harm. We therefore affirm the trial court's judgment.

## I. BACKGROUND

Lyndarrious Bray was found dead behind an ice skating rink. He had been shot four times; in the forehead, neck, head, and chest. Three bullets were recovered from his body.

Brenda King lived in a fourth floor apartment behind the ice rink, and her patio faced the ice rink parking lot. On the night in question, King heard a series of loud noises that sounded like firecrackers. She walked onto her patio and looked at the "backside of the skating rink." She saw a young man lying on the ground and a "guy" standing over him. The man who was standing started pacing, and Green realized that the sounds she heard were gunshots. She could not see whether the man standing over the body had anything in his hands, but she saw that he was wearing a white shirt, white pants, and white shoes.

King then saw four kids come "out of nowhere" and look at the man who had been pacing. Nobody checked the body for a pulse. The group, which consisted of "very young boys," walked toward the dumpster and began pushing each other.

King also saw a tall thin man come out from behind the dumpster. The man was not part of the group, and no one reacted to him. "All of the sudden" the man was gone.

A "bronze-orange" car pulled out from the side of the building. Although King could not see the driver, a female passenger with long blonde hair yelled, "Hurry up and get on the car." The five young men got into the backseat of the car and it drove away.

Officer Jerry Childree heard the shooting broadcast over the radio, and encountered appellant and Chris Kyle going towards the skating rink approximately 100-200 yards away. Appellant told Childree he had a phone call about a shooting and was there to check on a friend named "Lyn."

Appellant agreed to go to the police station for an interview. He was wearing a white shirt, gray pants, a white watch, white belt, and white shoes. When alone in the interview room, appellant slept, cleaned his shoes, counted his money, and prayed for forgiveness.

Detective Adam Perry interviewed appellant, who answered questions by repeating them. In Perry's experience, that behavior is a stall tactic. Although appellant claimed that he witnessed his "brother ['s]" murder, his demeanor was not appropriate for someone who had experienced such a thing.

Initially, appellant told Perry that he had gone behind a wall to urinate and discovered Bray had been shot when he returned. But he told several different stories in a subsequent interview. One account involved a man with a shotgun. Another account involved an accident, and another a robbery. Still another involved the possibility of Bray robbing someone. At some point, appellant said he was present when Bray was shot, but Kyle prevented him from walking to the body. Appellant also gave conflicting statements about whether Bray had a gun at the time of the shooting. Appellant also spoke of a white drug dealer that Perry identified as Christian Tippett.[1]

---

[1] The police later concluded that Tippitt was not involved because they could not place him at the scene.

Chris Kyle testified that he had known appellant since 2011 and would hang out with him every other weekend. On the night of Bray's murder, Kyle, appellant, Ashlee Green, and Bray went to the skating rink so that Bray and appellant could conduct a drug deal.

They parked the car near a dumpster, and Bray volunteered to go with appellant to conduct the deal. Green remained in the driver's seat, and Kyle was in the backseat talking to his girlfriend on the phone.

After about ten minutes, Kyle heard three or four gunshots. Green started to drive away, but turned around when she saw appellant in her rearview mirror. Kyle initially said he did not see appellant with a gun, but later said he did. He admitted that the latter was a lie that he told police because he was trying to save himself.

Kyle got out of the car and asked what happened. Appellant responded that "they" or "someone" shot "my bro." Kyle and appellant yelled at each other, and he pushed appellant to the ground. After appellant got up, they got into the car and Green drove away.

Green dropped Kyle and appellant at appellant's grandmother's apartment. No one was home, so Kyle and appellant walked back to the ice rink where they encountered the police officers who arrested them.

According to Kyle, he and appellant were "messed up," and "not in the right state of mind" that night because they had smoked marijuana and taken Xanax. Appellant had also been drinking.

Ashlee Green was appellant's "on and off" girlfriend. She had been with appellant throughout the day, driving her Orange Cobalt. They picked up Bray and Kyle because Bray wanted to do a drug deal.

According to Green, appellant was on the phone with a guy known as "Snow White," or "White Boy," who wanted to meet at Kroger for the drug deal. But "White Boy" later changed the deal's location to the alley behind the ice rink.

–4–

Appellant and Bray got out of the car at the ice rink. After a while, Green heard gunshots, and a little later, heard appellant scream. She drove in the direction appellant and Bray had gone, but saw appellant in her rearview mirror and turned around. Appellant did not have a gun when she saw him.

Green drove to appellant's grandmother's apartment. Appellant was screaming, "They shot my n–" repeatedly. No one was at home at appellant's grandmother's house, and appellant and Kyle just walked away.

Green later told the police that appellant had a problem with Bray concerning money and Bray had stolen appellant's IPad. Appellant had also confronted Bray about taking Granny B's (appellant's grandmother) stuff.

Green admitted that on the Wednesday or Thursday before the shooting, appellant and Bray were in the same house and both of them were texting her. She received a text message from appellant's phone that said, "Please come and get me or it will be a murder case."

She also told the police that it was probably appellant who had the gun, and after the shooting, she saw appellant pulling the bullets out of the gun by the trash can. She said she thought [the situation] was about appellant "confronting, trying to be a boss man, trying to make a point to everyone that he's not playing no more." When asked if she thought appellant would tell the truth when he talked to police, Green replied, "Hell no." At trial, however, Green claimed she did not remember much of what she told the police.

Tippitt admitted to taking an unloaded shotgun to a different drug deal. But he testified that he was not present behind the ice rink when Bray was killed, he did not take his shotgun there to threaten anyone, and he did not attempt to rob anyone.

A couple of weeks after the murder, Detective Perry received a call from the owner of appellant's grandmother's apartment complex. Perry went to the complex and found a nine-shot

.22 caliber revolver buried in the flowerbed in front of the leasing office. The gun had seven empty chambers in the cylinder, and Perry sent it to ballistics for analysis.

Six shell casings and one live cartridge were recovered from the crime scene. All were .22 caliber.

The ballistics analyst could not identify or eliminate the revolver found at the apartments as having fired the bullets recovered from Bray's body. But it was included as one of the possible firearms that could have fired those bullets. The revolver holds nine cartridges that have to be manually loaded. So if the trigger was pulled nine times, the cartridge cases would not come out unless one manually opened the action and removed them.

The analyst examined six cartridge cases. Three were identified as having been fired from the .22 revolver. One of the cartridges recovered at the crime scene had also been fired from that gun. The analyst was unable to identify or eliminate the remaining two cartridges as having been fired from the gun. None of these cartridges were fired from a shotgun.

Perry also discovered text messages between appellant and others in which appellant suggested he was going to kill Bray because he owed him money.

When the evidence concluded, the jury convicted appellant of murder, and subsequently assessed punishment at fifty-five years imprisonment.

## II. ANALYSIS

### A. Charge Error

The indictment alleged that appellant caused LB's death by (i) intentionally and knowingly shooting him with a firearm, or (ii) intended to cause Bray serious bodily injury and committed an act clearly dangerous to human life by shooting Bray with a firearm and causing his death.

The charge tracked the statutory language for both types of murder alleged in the indictment, *see* TEX. PENAL CODE § 19.02(b)(1), (b)(2), and included definitions for knowing,

intentional, and reckless mental states. It also included instructions on self-defense, transferred intent, and manslaughter.

Appellant's first four issues argue that the trial court's charge was erroneous because: (i) the self-defense instruction followed the murder and transferred intent application paragraphs; (ii) self-defense and culpable mental state instructions were not included in the transferred intent application paragraph; (iii) the self-defense instruction did not include murder committed under penal code §19.02(b)(2), and (iv) the self-defense instruction referenced but did not provide the elements for robbery or aggravated robbery or apply them.

### 1.     Standard of Review and Applicable Law

"Where, as here, the defendant did not raise a timely objection to the jury instructions, reversal is required only if the error was fundamental in the sense that it was so egregious and created such harm that the defendant was deprived of a fair and impartial trial." *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015).

Error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *See, e.g., Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013).

In making an egregious harm determination, we examine (i) the entire charge; (ii) the state of the evidence, including contested issues and weight of the evidence; (iii) arguments of counsel; and (iv) any other relevant information revealed by the record of the trial as a whole. *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008).

Jury charge content is governed by code of criminal procedure article 36.14, which requires the judge to deliver "a written charge distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PROC. art. 36.14. The jury charge's purpose "is to inform the jury of the applicable law and guide them in its application to the case." *Hutch v. State,* 922 S.W.2d 166, 170 (Tex.

Crim. App. 1996). When a trial judge instructs on a defensive issue on his own motion, he must do so correctly. *Mendez v. State*, 545 S.W.3d 548, 553 (Tex. Crim. App. 2018).

Abstract or definitional paragraphs in a charge serve as a kind of glossary to help the jury understand the meaning of concepts or terms used in the application paragraphs. *Plata v. State*, 926 S.W.2d 300, 302 (Tex. Crim. App. 1996), *overruled on other grounds by Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

On the other hand, application paragraphs apply the relevant law, the abstract definitions, and general legal principles to the particular facts and the indictment allegations. *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012). Because the application paragraph specifies "the factual circumstances under which the jury should convict or acquit, it is the 'heart and soul' of the jury charge." *Id*. at 367.

When a definition or instruction on a theory of law is given in the charge's abstract portion charge, the application paragraph must (i) specify "all of the conditions to be met before a conviction under such theory is authorized"; (ii) authorize "a conviction under conditions specified by other paragraphs of the jury charge to which the application paragraph necessarily and unambiguously refers"; or (iii) "contain some logically consistent combination of such paragraphs." *Id.*

### 2. Self-Defense Instruction Sequence

Appellant's first issue argues that the self-defense instruction was not proper because it followed the application paragraphs for murder and transferred intent. According to appellant, this sequence allowed the jury to find him guilty of murder without first being instructed on self-defense, and was tantamount to instructing the jurors that self-defense did not apply to murder. We are not persuaded by these arguments.

A jury instruction's meaning must be taken from the whole charge. *Delapaz v. State*, 228 S.W.3d 183, 212 (Tex. App.—Dallas 2007, pet. ref'd). Here, the jury was instructed that, "you may read these instructions as a whole." We assume the jury follows the instructions as given. *See Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996).

Regarding the order of the instructions, this court has previously considered a similarly sequenced charge and concluded it was not erroneous. *See Wippert v. State*, Nos. 05-96-00573-74-CR, 1998 WL 205798, at *1 (Tex. App.—Dallas Apr. 29, 1998, pet .ref'd) (not designated for publication). In *Wippert*, the self-defense instruction followed the application paragraphs for aggravated assault and murder. *Id.* We concluded that, read as a whole, the charge adequately instructed the jury to acquit the defendant if it had reasonable doubt concerning whether he acted in self-defense. *See id.*; *see also Epley v. State*, 704 S.W.2d 502, 505 (Tex. App.—Dallas 1986, pet. ref'd) (self-defense instruction that followed instructions for murder, voluntary manslaughter, aggravated assault, involuntary manslaughter, and criminally negligent homicide adequately instructed jury to acquit of it had reasonable doubt that defendant acted in self-defense).

Nonetheless, appellant relies on *Barrera v. State*, 982 S.W.2d 415, 416 (Tex. Crim. App. 1998) to globally assert that any flaw in the charge on self-defense amounts to an error in the charge. Appellant's argument, however, applies the *Barrera* holding out of context.

In *Barrera*, the defendant did not object to the charge or request a self-defense instruction. Nonetheless, the trial court, sua sponte, included a self-defense instruction in the charge. But the instruction did not inform the jury that a reasonable doubt on the self-defense issue required an acquittal, or apply the law of self-defense to the case. *Id.* The court of criminal appeals considered the proper standard of review when, in the absence of an objection, a jury charge includes the definition of self-defense but does not include self-defense in the application paragraph. *Id*. at 416. The court held that, "having undertaken on its own to charge the jury on this issue, the trial

court signaled that self-defense was the law applicable to the case. *Therefore, any flaw in the charge on self-defense amounts to an error in the charge . . . .*" (*Id.*) (emphasis added). However, there was no argument or discussion about the sequence in which the self-defense instruction appeared. *See id.*

The self-defense instruction in the present case had none of *Barrera's* flaws. Here, the trial court defined the necessary terms and instructed the jury on self-defense in the abstract portion of the instruction. The abstract portion of the instruction was followed by an application paragraph applying the law of self-defense to the facts of the case. And, significantly, it instructed the jury to acquit appellant if they had a reasonable doubt as to whether he acted in self-defense. *See* TEX. PENAL CODE ANN. § 2.03(d) (if the existence of a defense is submitted to the jury, the court shall charge that reasonable doubt on the issue requires acquittal). We therefore conclude that the trial court did not err by placing the self-defense instruction after the murder and transferred intent instructions, and we resolve appellant's first issue against him.

### 3. Transferred Intent

Appellant's second issue argues that the charge was erroneous because the transferred intent application paragraphs did not include self-defense or culpable mental states. We disagree.

A person is criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked, is that a different person was injured, harmed, or otherwise affected. *See* TEX. PENAL CODE §6.04(b)(2). This statutory principle is commonly referred to as transferred intent. *See Manrique v. State*, 994 S.W.2d 640, 647 (Tex. Crim. App. 1999) (McCormick, J., concurring).

Transferred intent is raised when there is evidence that a defendant with the required culpable mental state intends to injure or harm a specific person but instead injures or harms a different person. *Delacerda v. State*, 425 S.W.3d 367, 397 (Tex. App.—Houston [1st Dist.] 2011,

–10–

pet. ref'd). The classic example is "the act of firing [a gun] at an intended victim while that person is in a group of other persons. If the intended person is killed, the offense is murder. If a different person in the group is killed, the offense is murder pursuant to TEX. PENAL CODE § 6.04(b)(2) . . . ." *Roberts v. State*, 273 S.W.3d 322, 330 (Tex. Crim. App. 2008), *abrogated in part on other grounds by Ex parte Norris*, 390 S.W.3d 338, 341 (Tex. Crim. App. 2012).

Here, the charge instructed:

### Murder – Transferred Intent

A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that a different person was injured, harmed, or otherwise affected.

Now bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt, that on or about February 17, 2013, in Dallas County, Texas, the defendant, while desiring or contemplating causing the death of Christian Tippitt or others, caused the death of [L.B.], an individual, by shooting [L.B.] with a firearm, a deadly weapon, you will find the defendant guilty of the offense of murder and say so by your verdict.

OR

If you believe from the evidence beyond a reasonable doubt that on or about February 17, 2013, in Dallas County, Texas, the defendant, while desiring or contemplating causing serious bodily injury to Christian Tippitt or others, committed an act clearly dangerous to human life, to-wit: shooting [L.B.] with a firearm, a deadly weapon, and thereby caused the death of [L.B.], an individual, you will find the defendant guilty of the offense of murder and say so by your verdict.

Appellant relies on *McCullough v. State*, 62 Tex. Crim. 126, 128 (Tex. Crim. App. 1911) and *Curtis v. State*, 119 Tex. Crim. 398, 404–05 (Tex. Crim. App. 1931) to argue that the law of self-defense is applicable to transferred intent. This reliance is misplaced.

Texas Penal Code § 9.05, enacted after the foregoing cases were decided, provides:

Even though an actor is justified under this chapter in threatening or using force or deadly force against another, if in doing so he recklessly injures or kills an innocent third person, the justification afforded by this chapter is unavailable in a prosecution for the reckless injury or killing of an innocent third person.

*See* TEX. PENAL CODE § 9.05.[2]  Thus, while prior law provided that if an accused was justified in using force against an assailant, he was further justified for killing or injuring an innocent bystander, § 9.05 altered that law.  *See Buard v. State*, No. 05-99-00426-CR, 2000 WL 348564, at *7 (Tex. App.—Dallas Apr. 5, 2000, no pet.) (not designated for publication); *see also Banks v. State*, 955 S.W.2d 116, 118 (Tex. App.—Fort Worth 1997, no pet.).  As we held in *Buard*, "there is no justification corollary to the doctrine of transferred intent."  *Buard,* 2000 WL 348564, at *7.

We are also not persuaded by appellant's argument that the instruction was erroneous because it failed to include applicable mental states.  The court's instruction tracked the statutory definition of transferred intent.  *See* TEX. PENAL CODE §6.04 (b)(2).  A jury charge that tracks the language of a statute is a proper charge on the statutory issue.  *Wood v. State*, No. 05-97-00411-CR, 2001 WL 1047073, at *8 (Tex. App.—Dallas Sept. 13, 2001, no pet. (not designated for publication) (citing *Martinez v. State*, 929 S.W.2d 693, 699 (Tex. Crim. App. 1996)).

Moreover, the culpable mental states are defined elsewhere in the charge and are included in the murder application paragraphs.  The transferred intent instruction appeared immediately after the murder application paragraphs and made clear that it was applicable to murder with the heading "Murder-Transferred Intent."

For these reasons, we hold that the charge was not erroneous for failure to include self-defense or mental states in the transferred intent instruction and resolve appellant's second issue against him.

### 4.    Self-Defense Instruction Omissions

Appellant's third and fourth issues complain about omissions in the self-defense instruction.  Specifically, he maintains the instruction was erroneous because it did not include (i)

---

[2] A person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force.  TEX. PENAL CODE § 9.31(a).

murder committed under §19.02(b)(2) (intending to cause serious bodily injury and committing an act clearly dangerous to human life that causes the death of an individual), and (ii) did not provide or apply the elements of aggravated robbery and robbery.  We conclude no error occurred in issue three and in issue four, that appellant did not suffer resulting egregious harm.

### a.     Did error result from a charge and if so, Was appellant harmed by not expressly including §19.02(b)(2) murder in the self-defense application paragraph?

Here, the application paragraph murder instruction included murder as defined by both §§19.02(b)(1) and (2):

Murder

> Now bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt, that on or about February 17, 2013, in Dallas County, Texas, the defendant, intentionally or knowingly caused the death of [L.B.], an individual, by shooting [L.B.] with a firearm, a deadly weapon, you will find the defendant guilty of the offense of murder and say so by your verdict.

> OR

> If you believe from the evidence beyond a reasonable doubt that on or about February 17, 2013, in Dallas County, Texas, the defendant, intended to cause serious bodily injury to [L.B.], and committed an act clearly dangerous to human life by shooting [L.B.] with a firearm, a deadly weapon, and did thereby cause the death of [L.B.], you will find the defendant guilty of the offense of murder and say so by your verdict.

And the application paragraph's self-defense instruction began by stating, "In regards to the offenses of murder and manslaughter, you are instructed as follows . . . ."  But it did not limit the self-defense instruction to only §19.02(b)(1) murder.  The jury had both manner and means of committing the offense of murder.  Thus, viewing the charge as a whole, the jury would have understood that self-defense applied to both murder theories defined in the murder instruction.  We conclude no error is presented.

Furthermore, even if we assume error, the state of the evidence, including contested issues and the weight of the evidence, does not support egregious harm.  *See Allen*, 253 S.W.3d at 264.

The State's primary theory was that appellant knowingly and intentionally killed Bray. Several days before the murder, as well as the night before, appellant was threatening to kill Bray because Bray owed him money and had stolen from appellant's grandmother. In addition, when appellant was with Bray, he (or someone using his phone) sent a text message saying, "Please come and get me or it will be a murder case."

Additionally, Bray suffered four gunshot wounds to the forehead, neck, head, and chest, and nobody checked his body for a pulse. A nine-shot .22 caliber revolver with seven empty chambers in the cylinder was found buried in appellant's grandmother's flower bed—and appellant went directly to his grandmother's house after the shooting. Thus, while the State argued section 19.02(b)(2) murder as an alternative, nothing about the evidence showed or led to an inference that the shooter acted with anything other than an intent to kill.

Moreover, the State's arguments also emphasized intentional murder. For example, the State argued, "It was not an accident, ladies and gentlemen. Because it was murder. Because this man is a cold killer."

And the defense did not argue about appellant's mental state at all. Instead, counsel focused on whether there was reasonable doubt that appellant was the one who killed Bray. For example, defense counsel argued:

> I can't tell you beyond a reasonable doubt that Christian Tippett is the person who killed Mr. Bray. I can tell you he's out there. They can't prove beyond a reasonable doubt that [appellant] is the person who killed Mr. Bray. They know that. They know that. That's why they [are] still dealing with Christian Tippett.

The defense further argued, "If they can't tell you how many people are in the alley when he's [sic] shot them, they can't tell you beyond a reasonable doubt that [appellant] is the person who shot him."

Furthermore, self-defense was not a vital defense theory used to justify the murder—whether it was section 19.02(b)(2) murder or otherwise. For example, defense counsel asked only

–14–

three general questions about self-defense in voir dire, and did not mention it in his opening statement. Likewise, defense counsel did not argue self-defense in his closing argument. Instead, he argued that the State had "No idea what happened" and had conducted a rushed investigation. No witnesses testified that appellant acted in self-defense, nor did any other evidence suggest that he had done so. No egregious error is shown.

### b. Was appellant harmed by omitting the robbery and aggravated robbery elements, or the application of these elements to the facts of the case?

The language in the self-defense charge complained of in this issue was taken directly from the penal code § 9.32(a)(2)(B). The instruction told the jury that a person may use deadly force to prevent another person's imminent commission of a series of crimes including robbery and aggravated robbery. The charge did not define any of the listed crimes or apply them to the facts of the case. Appellant complains of the failure to list the elements of aggravated robbery or robbery, just two of the crimes enumerated in the charge.

Assuming error, the evidence that a robbery occurred was a remote, tangential theory that was not supported by any evidence other than one of the several versions of events appellant gave to the police. Defense counsel did not mention robbery in opening statement or closing argument. Instead, he argued, "This is pay back. This is drug dealing. This is payback time." The State did not mention robbery at all.

Similarly, when Kyle testified, he did not say that he saw Tippitt, a robbery, an attempted robbery, or any deadly force or attempted deadly force. Tippitt testified that he was not there, and did not threaten or attempt to rob anyone with his shotgun. None of the cartridge casings received from the scene came from a shotgun. And the police concluded that Tippitt was not involved because they could not place him at the scene.

Moreover, as previously discussed, self-defense would not justify Bray's killing during a robbery. For example, if Christian Tippitt had robbed or attempted to rob appellant, and appellant

–15–

recklessly killed Bray as an innocent third party, self-defense would not justify the killing. *See* TEX. PENAL CODE § 9.05.

Because the possibility of robbery was so far removed from the facts established by the evidence, we cannot conclude that the omitting the elements of robbery and aggravated robbery or failing to apply them caused appellant egregious harm.

Finally, we do not find any other relevant information to support a conclusion that the complained-of omissions were harmful. *See Allen*, 253 S.W.3d at 264.

### c. Conclusion

Under these circumstances, we cannot conclude that the omission of the §19.02(b)(2) theory of murder or the elements of robbery and aggravated robbery from the self-defense instruction affected the very basis of the case, deprived appellant of a valuable right, or vitally affected a defensive theory. *See Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007). We therefore resolve appellant's third and fourth issues against him.

## B. Improper Argument

Appellant's fifth issue argues that the prosecutor's improper argument violated his constitutional right to be presumed innocent. We reject this argument.

During trial, the State introduced social media evidence showing a 2016 post from Green saying that she was engaged to appellant. Green denied the engagement, however, and said she made the post to annoy Kyle's sister.

Then in closing argument, the State argued:

Let's talk about [Green]. Only thing you need to know about her. What did she tell you, we're on again, off again . . . Happy he saved my life. Engagement ring. I think it's clear who she is engaged to. She wanted to tell you this is about Cara Kyle, the sister of Chris, and whatever else. Really? You know that's not true. Three years after? He's been in jail this whole time ladies and gentlemen.

Defense counsel objected, "Improper argument," and the trial judge responded, "Jury will recall the evidence as they heard it. Proceed."

After the jury retired to deliberate, the judge noted for the record that defense counsel's objection had been overruled and "the defense exception noted."

A point of error on appeal must comport with the objection made at trial. *Yazdchi v. State*, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014). Here, appellant's "improper argument" objection does not comport with his constitutional argument on appeal because the "improper argument objection" does not necessarily include a violation of "the right to be presumed innocent."

Moreover, to preserve error regarding allegedly improper argument, a party must object and pursue an adverse ruling; request an instruction for the jury to disregard if the improper argument is curable; and move for a mistrial if the instruction is given. *See Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007).

Furthermore, requests for instructions to disregard must be timely made. *Raborn v. State*, No. 05-10-00685-CR, 2011 WL 653776, at *1–2 (Tex. App.—Dallas Feb. 24, 2011, no pet.) (not designated for publication). A request for an instruction after the jury retires to deliberate is not timely. *See id.*

In this case, appellant's counsel did not request a ruling, an instruction, or move for a mistrial. Thus, the point has not been preserved for our review. *See* Tex. R. App. P. 33.1(a).

But even had the point been preserved, the record does not demonstrate that appellant was harmed thereby. Improper jury arguments are nonconstitutional violations governed by Rule 44.2(b). *See Mosely v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998); Tex. R. App. P. 44.2 (b). And even if an argument was improper, it does not constitute reversible error unless, in light of the entire record, the argument is extreme or manifestly improper, violates a mandatory statute, or injects harmful new facts about the accused into the proceeding. *Westbrook v. State*, 29 S.W.3d

103, 115 (Tex. Crim. App. 2000). The remarks must have been a willful and calculated effort to deprive appellant of a fair trial. *Id.* The argument here was not such an argument.

Firstly, the prosecutor's remarks were not the first reference to incarceration. During jury selection, defense counsel described what happens to a person arrested for murder. During this explanation, he said:

> Better hope he's saved himself a few $1,000 so that he can post a bond or hire himself a lawyer. Otherwise, guilty or not guilty, he'll sit in the jail cell, seven days a week, 24 hours a day, until his case is called for trial.

The jurors were aware that appellant had been arrested after the murder.

Secondly, the argument was made in the context of challenging Green's credibility; specifically, whether her testimony about the Facebook post was credible. Thus, the argument did not directly pertain to appellant's guilt or innocence.

Finally, the court verbally instructed the jury to rely on their own recollection of the evidence, and the court's written charge instructed that the fact that the defendant had been arrested, confined, or indicted did not give rise to an inference of guilt.

Therefore, even if the prosecutor's remark was improper, nothing in the record establishes that the argument was a willful and calculated effort to deprive appellant of a fair and impartial trial that caused appellant harm. Appellant's fifth issue is resolved against him.

### III. CONCLUSION

Having resolved all of appellant's issues against him, we affirm the trial court's judgment.

/Bill Whitehill/
_____
BILL WHITEHILL
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
170016F.U05

–18–



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

MARKAILON ADRELL DAILEY, Appellant

No. 05-17-00016-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 5, Dallas County, Texas
Trial Court Cause No. F-1345287-L.
Opinion delivered by Justice Whitehill.
Justices Francis and Fillmore participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered July 16, 2018.